[S. F. No. 20886. In Bank. Aug. 5, 1963.]

HERBERT E. ELLIS, JR., Plaintiff and Appellant, v. PERICLES MIHELIS et al., Defendants and Appellants.

Orr, Heuring & Wendel and Victor D. Rosen for Plaintiff and Appellant.

Alfred Nelson and Jerome R. Waldie for Defendants and Appellants.

GIBSON, C. J.—Herbert Ellis brought this action against Pericles Mihelis and Elias Mihelis to compel them to specifically perform a contract for the sale of real property and for damages resulting from their failure to convey the property to him. Defendants have appealed from the judgment decreeing specific performance and awarding damages. Plaintiff has cross-appealed on the issue of damages.

The principal contentions of defendants are (1) that plaintiff is precluded from relying on the contract because he was represented in the transaction by an agent whose action was not shown to have been authorized or ratified in writing before defendants refused to perform and (2) that the agreement can in no event be binding on Elias because he did not sign the contract and did not authorize Pericles in writing to enter into it on his behalf. If the first of these contentions is correct plaintiff has no cause of action against either defendant, whereas the second contention, if valid, would not, of course, be determinative of plaintiff's rights as against Pericles. We have concluded that the first contention is untenable but that defendants are correct as to the second point.

Defendants, who are brothers, own two ranches, both operated in the usual manner as ranch or farming property, one by Pericles in Stanislaus County and the other by Elias in Santa Cruz County. In 1948, following the death of a third brother, a judicial decree was entered declaring that both ranches had been owned by the three brothers in joint tenancy with right of survivorship and that upon the death of the brother the title vested absolutely in Pericles and Elias. All income and expense of the two ranches were lumped together for income tax purposes, partnership tax returns were filed with respect to income from the ranches, and the income derived from the two operations was divided equally between the personal income tax returns of the two brothers.

In 1957 the brothers decided to sell the Stanislaus County ranch and agreed that Pericles should handle negotiations for the sale and submit any prospective deals to Elias. Pericles listed the property with a real estate broker in Stanislaus County, George Moreno, telling him that he was the owner.

About this time plaintiff became interested in purchasing a parcel of real property in Alameda County owned by the Ratto family, but the Rattos did not want to sell for cash because of the capital gains tax. They were willing, however, to exchange their property for a ranch, and plaintiff orally authorized Antone L. Ratto, Jr., to act for him in locating and arranging for the purchase of a ranch to effect the exchange. An escrow was opened with an Oakland title company with respect to the Alameda County property, and plaintiff deposited $10,000 in that escrow. Ratto, learning that the Stanislaus ranch was for sale, contacted Moreno and told him of the arrangement between plaintiff and Ratto and of Ratto's interest in purchasing the ranch. Moreno, on the basis of what Pericles had said to him, told Ratto that Pericles was the owner. Ratto and Moreno thereafter informed Pericles of the trade arrangement and explained among other things that plaintiff, not Ratto, was to take title to the Stanislaus property initially.

On April 17, 1958, Pericles and Moreno with the assistance of Pericles' friend, the president of the Stanislaus County Title Company, prepared an instrument using a printed form denominated "Agent's Deposit Receipt." The instrument, bearing the above date, acknowledged receipt of $5,000 as a deposit on account of the purchase price of the described property and provided for a total purchase price of $165,000,

the balance to be paid $30,000 within 30 days from date and $130,000 by note bearing interest at 5 per cent per annum, payable in specified installments, and secured by a deed of trust and crop mortgage. It also provided that "the amounts paid hereon" could be retained by the seller as consideration for execution of the agreement if the buyer failed to complete the purchase. On April 17 Pericles signed below a provision which recited, "I (or we) agree to sell and convey the above described property on the terms and conditions herein stated, . . ."

Moreno informed Ratto that the agreement had been signed by Pericles. Ratto notified plaintiff, who thereupon instructed him to sign plaintiff's name to the agreement. Pursuant to plaintiff's direction the Oakland title company made out a check in the sum of $5,000 payable to the Stanislaus title company "for the account of Herbert E. Ellis, Jr." On April 19 Ratto delivered the check to Moreno, and the blank space in the agreement for the signature of the buyer was signed by Ratto as follows: "Herbert E. Ellis, Jr. By Antone L. Ratto Jr." Moreno showed the agreement and the check to Pericles who said he was "very satisfied on the whole thing." Pericles asked if he could keep the money, and, when Moreno said that it would have to be deposited with the title company Pericles made no objection. The agreement and check were placed in escrow with the Stanislaus title company and the check was cashed by the title company. Between April 19 and May 2, at the request of Pericles, one of the Ratto brothers and his family moved to Stanislaus County and did some crop-dusting on the ranch.

On May 2, 1958, Pericles, Elias, Ratto, and Moreno met at the ranch. Until then, neither Ratto nor Moreno knew that Elias had an interest in the property. Pericles stated that he had changed his mind and did not want to sell, that he was not "going through with the deal," that as a result of a frost occurring a few days earlier which had damaged some vineyards in the area but left his grapes unharmed his crop had become too valuable for him to sell the ranch, and that he could get the same price after the harvest. He also stated, "I will probably have to sell you my half, but my brother doesn't want to sell; Elias doesn't want to wait 10 years." Elias said that he did not want to sell and that he did not want to wait 10 years for his money.

On May 12 plaintiff ratified in writing Ratto's acts in con-

nection with the purchase of the Stanislaus ranch and placed in the escrow the additional $30,000 called for by the agreement, the note for $130,000, the deed of trust, and the crop mortgage.

The trial court found among other things that Pericles and Elias operated the ranch as partners, that the ranch was an asset of the partnership, and that each orally authorized the other to sell the ranch for the partnership. The court also found that Ratto, in executing the contract in plaintiff's name, acted pursuant to express oral authority given by plaintiff, that plaintiff accepted the terms of the agreement and entered into it on April 19, that the agreement was fair and equitable, and that plaintiff offered to perform all its conditions, but that defendants without just cause refused to perform.

Before discussing the principal questions involved, we should point out that we find no merit in defendants' contentions that the contract is too uncertain to be specifically performed and that equity should not enforce it because, assertedly, the arrangement between plaintiff and the Rattos was a scheme to avoid taxes.

■■■ As we have seen, defendants contend that plaintiff is foreclosed from relying on the agreement because he did not sign it and did not authorize or ratify Ratto's action in writing before defendants refused to perform on May 2. Section 1624, subdivision 4, of the Civil Code provides that an agreement for the sale of real property is invalid unless the same or some memorandum thereof is in writing and subscribed by ''the party sought to be charged'' or by an agent of his who has authority in writing. (See also Civ. Code, §§ 1091, 2309; Code Civ. Proc., § 1973, subd. 4.) Defendants, not plaintiff, are the parties to be charged, but they nevertheless make two arguments based on this provision with respect to the absence of written authorization by plaintiff. One argument is that a binding signature was contemplated as necessary to the acceptance of Pericles' offer and that no contract had come into being because Ratto, who signed on behalf of plaintiff, did not have authority in writing. The other argument is that even if there was an agreement plaintiff would be precluded from compelling performance of it because it could not have been enforced against him on May 2 and therefore lacked mutuality.

Defendants rely on the general rule that, when the parties contemplate that an agreement will be executed by the sign-

ing of all parties and will become effective only after such signature, the contract will not be binding until the parties have signed. (See, e.g., *Sparks* v. *Mauk,* 170 Cal. 122, 123 [148 P. 926]; *Spinney* v. *Downing,* 108 Cal. 666, 668 [41 P. 797]; *American Aero. Corp.* v. *Grand Central Aircraft Co.,* 155 Cal.App.2d 69, 80 [317 P.2d 694].) When plaintiff was informed that Pericles had signed the agreement, he instructed Ratto to sign his (plaintiff's) name to it. The signing of plaintiff's name by Ratto was purely a mechanical act which did not involve the exercise of discretion, and it has been held that where the signing by an agent is an act of this character the authorization by the principal is not required to be in writing and the signature is to be treated as that of the principal whether or not he was present at the execution of the agreement. (*Kadota Fig Assn.* v. *Case-Swayne Co.,* 73 Cal.App.2d 815, 818-821 [167 P.2d 523]; *Murphy* v. *Munson,* 95 Cal.App.2d 306, 311 et seq. [212 P.2d 603]; *Burdine* v. *Severin Motors, Inc.,* 147 Cal.App.2d 751, 755-756 [305 P.2d 1008].) It has also been held that, where execution in writing of an agreement was expected and the execution obtained may have been defective because no due authorization of the agents who signed for the plaintiff was proved, the circumstances may make it unconscionable to permit the defendant to rely on the lack of proof of proper execution. (*Vitagraph, Inc.* v. *Liberty Theatres Co.,* 197 Cal. 694, 697 [242 P. 709].) Under the circumstances before us it would be clearly inequitable to allow defendants to avoid the agreement because of lack of written authorization by plaintiff.

Plaintiff not only gave Ratto oral authorization to enter into the transaction and to sign his name to the agreement but also deposited the sum of $5,000 in accordance with the terms of the agreement, which called for forfeiture of the money in the event of default by him. Pericles saw the agreement as signed by Ratto and expressed his satisfaction with "the whole thing," and with his permission the agreement and the deposit were placed in escrow. He was fully aware of the arrangement between the Rattos and plaintiff and knew that it was to plaintiff's interest to go through with the contract not only because of the forfeiture provision but also because the purchase of the ranch would enable plaintiff to complete his transaction with the Rattos. He insisted that the Rattos start work on the ranch, and he knew that one of the Ratto brothers and his family moved to Stanislaus County

for that purpose and started crop-dusting. The refusal of defendants to abide by the agreement was not based on the claim that Ratto lacked written authorization but on the circumstances that the grape crop had increased in value and that Elias did not approve of the agreement. Plaintiff ratified the contract in writing and tendered full performance within the time specified. So far as appears, the defense now urged was an afterthought, raised for the first time when defendants had already obtained everything for which the written authorization could have been important to them, namely, the certainty of full performance by plaintiff.

The claim of a lack of mutuality is likewise untenable. The old doctrine that mutuality of remedy must exist from the time a contract was entered into has been so qualified as to be of little, if any, value, and many authorities have recognized that the only important consideration is whether a court of equity which is asked to specifically enforce a contract against the defendant is able to assure that he will receive the agreed performance from the plaintiff. (See, e.g., 5 Corbin on Contracts (1951) §§ 1180, 1181, 1183, 1185, 1190, 1192; Rest., Contracts, com. a on § 372 (1); Stone, *The "Mutuality" Rule in New York* (1916) 16 Colum. L.Rev. 443, 444-445, 464.) As was said by Justice Cardozo, "If there ever was a rule that mutuality of remedy existing, not merely at the time of the decree, but at the time of the formation of the contract, is a condition of equitable relief, it has been so qualified by exceptions that, viewed as a precept of general validity, it has ceased to be a rule to-day. [Citations.] What equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or to defendant. [Citations.] Mutuality of remedy is important in so far only as its presence is essential to the attainment of that end." (*Epstein* v. *Gluckin,* 233 N.Y. 490 [135 N.E. 861, 862].)

Our statutes are largely in accord with the modern view regarding mutuality of remedy. Section 3386 of the Civil Code, which provides, "Neither party to an obligation can be compelled specifically to perform it, unless the other party thereto has performed, or is compellable specifically to perform, . . ." is followed by section 3388, which provides: "A party who has signed a written contract may be compelled specifically to perform it, though the other party has not signed it, if the latter has performed, or offers to perform

it on his part, and the case is otherwise proper for enforcing specific performance.'' ▆ It has been held from an early date in this state that, where a party commences an action to compel the specific enforcement of an agreement for the sale of real property, the requirement of mutuality is satisfied, the theory being that by bringing the action the plaintiff has submitted himself to the jurisdiction of equity and thereby enables the court to assure performance by him. (*Vassault* v. *Edwards,* 43 Cal. 458, 464-465; see *Harper* v. *Goldschmidt,* 156 Cal. 245, 251 [104 P. 451, 134 Am.St. Rep. 124, 28 L.R.A. N.S. 689]; cf. *Gosnell* v. *Lloyd,* 215 Cal. 244, 253 [10 P.2d 45].)

▆ There are also cases holding that, where there is an agreement for the sale of real property which has been signed by the seller but not by the buyer, a deposit by the buyer which is subject to forfeiture prevents the seller from withdrawing from the agreement before the time specified for performance by the buyer. (*Copple* v. *Aigeltinger,* 167 Cal. 706, 709-710 [140 P. 1073] (deposit paid directly to seller); *Wood Bldg. Corp.* v. *Griffitts,* 164 Cal.App.2d 559, 565 [330 P.2d 847] (deposit made by a check placed in escrow and cashed).)

▆ Some cases contain language indicating that where the buyer has not signed an agreement for the sale of real property, the seller who has signed has a right to withdraw from the agreement at any time before the offer for full performance by the buyer. (See *Nason* v. *Lingle,* 143 Cal. 363, 367 [77 P. 71]; *San Francisco Hotel Co.* v. *Baior,* 189 Cal. App.2d 206, 211 [11 Cal.Rptr. 32]; *Seymour* v. *Shaeffer,* 82 Cal.App.2d 823, 825 [187 P.2d 95]; *Jonas* v. *Leland,* 77 Cal. App.2d 770, 777 [176 P.2d 764].) This language, which was either dictum or was used in factual situations distinguishable from the one before us, is disapproved insofar as it may be understood to mean that there is such a right of withdrawal without regard to the equities involved.

We conclude that plaintiff was entitled to rely on the agreement whether or not he authorized or ratified Ratto's action in writing before defendants refused to perform.

▆ Although plaintiff may rely on the agreement, it does not follow that he may hold Elias, who did not sign it or authorize Pericles in writing to act as his agent. In seeking to overcome the requirement of the statute of frauds that an agreement for the sale of real property must be signed by the party to be charged or by an agent who has authority in

writing, plaintiff contends that there is an overriding provision in the Uniform Partnership Act (Corp. Code, §§ 15001-15045) which is applicable to the facts of this case and which empowered Pericles to bind Elias in the absence of written authority. It may be helpful in this connection to keep in mind that there is no evidence that defendants were in the business of buying and selling real estate or that the sale of the ranch was in the usual course of the partnership business.

The Uniform Partnership Act makes it clear that, unless it is otherwise provided therein, the usual rules of law and equity, including the law of agency, apply. (Corp. Code, §§ 15004, subd. (3), 15005.) As a provision overriding the statute of frauds plaintiff relies on section 15009, which reads in part: "(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. (2) An act of a partner which is not apparently for carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners. (3) Unless authorized by the other partners . . . , one or more but less than all the partners have no authority to: (a) Assign the partnership property in trust for creditors or on the assignee's promise to pay the debts of the partnership. (b) Dispose of the good will of the business. (c) Do any other act which would make it impossible to carry on the ordinary business of a partnership. . . ."

These provisions distinguish between acts of a partner which bind the partnership because of his status as a partner without any express authority being required and acts binding on the partnership only after express authorization by all partners. Under the express terms of subdivision (1) of the section all acts of a partner which are apparently within the usual course of the particular business bind the partnership. The effect of the provision is that the status of a partner, without more, serves as complete authority with respect to such acts, obviating the necessity of any express authority, either oral or written, from the other members of the firm.

It necessarily follows that insofar as a partner limits his conduct to matters apparently within the partnership business, he can bind the other partners without obtaining their written consent. Subdivision (2), however, provides that there must be express authority for acts of a partner which do not appear to be in the usual course of the business. This subdivision does not concern the form of the required express authority, and, unlike the broad provision in subdivision (1), it contains no language which would justify a conclusion that written authority is not necessary in situations where the statute of frauds would ordinarily be applicable.

The distinction made by subdivisions (1) and (2) between acts which are apparently in the usual course of business and those which are not is in accord with the cases in other jurisdictions which have held, without mention of any statutory requirement for written authority of an agent, that a contract executed by one partner alone to sell partnership real estate is binding on the other partners provided the partnership is in the business of buying or selling real estate and the property covered by the contract is part of the stock held for sale. (See 1 Bates, Law of Partnership (1888) § 299, pp. 297-299; Crane on Partnership (2d ed. 1952) § 50, p. 253; Gilmore on Partnership (1911) §§ 94-95, pp. 292-293; 1 Rowley on Partnership (2d ed. 1960) § 9.1, p. 286.) The distinction is also followed in section 15010 which provides that one partner may convey partnership realty or pass title to a partnership interest in realty depending, in some circumstances, upon whether the partner's act binds the partnership under subdivision (1) of section 15009.

Since it does not appear that the sale of the ranch was in the usual course of the partnership business, a contract to sell it would come within subdivision (2) of section 15009, not subdivision (1), even if the ranch were a partnership asset as found by the trial court. Accordingly, the statute of frauds would be applicable and Pericles could not bind Elias without authority in writing.

■ Moreover, the record does not support the finding that the ranch was property of the partnership. There was evidence that the ranch was operated by defendants as partners, but it is not unusual that property be used for partnership purposes and not belong to the partnership. (See *Grant* v. *Bannister,* 160 Cal. 774, 782 [118 P. 253]; see also *Azevedo* v. *Sequeira,* 132 Cal.App. 439, 443 [22 P.2d 745].) There was no showing that the ranch was acquired for the partner-

ship or with partnership funds or that the partnership existed at the time the ranch was acquired. (See Corp. Code, § 15008, subds. (1) and (2).) Under circumstances like those involved here, the mere fact that real property belonging to individual partners is used in the partnership business is not sufficient to justify the conclusion that it becomes a partnership asset. (See 1 Rowley on Partnership (2d ed. 1960) § 8.1, pp. 186, 190; 45 A.L.R.2d 1009, 1019-1020.)

The finding that the ranch was partnership property is not aided by the statement in the memorandum opinion of the trial court that real property improvements, including grapevines, pipeline, and the remodeled portion of the home, were annually depreciated in the partnership income tax returns as assets of the business. Although copies of the tax returns were shown to the trial judge in connection with the amount of damages to be awarded, they were not introduced in evidence.

The statute of frauds precludes enforcement of the agreement against Elias, and the judgment must be reversed as to him. On the record now before us Pericles could be compelled as a joint tenant to convey his half interest in the ranch (e.g., *Miller* v. *Dyer*, 20 Cal.2d 526, 529 [127 P.2d 901, 141 A.L.R. 1428]; *Marshall* v. *Caldwell*, 41 Cal. 611, 615), but the case was obviously not tried on that theory, and a reversal is also necessary as to Pericles. We, of course, do not know what evidence will be introduced or what remedy will be sought in the event of a retrial. Questions that may arise should plaintiff seek to recover damages against Pericles alone without specific performance or as incident thereto have not been briefed, and we shall not discuss them here, but for whatever assistance it may be we shall state our views concerning the contentions of the parties with respect to the damages awarded by the judgment.

Both plaintiff and defendants object to the damages awarded. The following general rules are applicable where damages are awarded incident to a decree of specific performance: A party to a contract for the purchase or exchange of land who is entitled to a decree of specific performance is also ordinarily entitled to a judgment for the rents and profits from the time he was entitled to a conveyance. The compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages. The complainant affirms the contract as being still in force and asks that it

be performed. If the court orders it to be performed, the decree should as nearly as possible require performance in accordance with its terms. One of the terms is the date fixed by it for completion, and since that date is past, the court, in order to relate the performance back to it, gives the complainant credit for any losses occasioned by the delay and permits the defendant to offset such amounts as may be appropriate. The result is more like an accounting between the parties than like an assessment of damages. (See, e.g., *Heinlen* v. *Martin*, 53 Cal. 321, 342-343; Note 7 A.L.R.2d 1204, 1206.)

The trial court awarded plaintiff the profits of the ranching operations, the rental value of a home on the ranch, and interest of 7 per cent on $35,000 for about seven months, the period during which plaintiff left that sum in escrow. In calculating the profits the court included in the expenses an allowance of $500 per month for the services of Pericles as manager of the ranch. As an offset against the profits, rental value, and interest, defendants were permitted to deduct interest at the contract rate of 5 per cent which they would have received on the $130,000 note if the installment payments on it had been made as agreed, but they were not allowed to deduct interest on the installment payments for the period after the due dates fixed in the agreement. Nor were defendants permitted to deduct interest with respect to the $35,000 cash payment. On this basis the court calculated the damages to November 1, 1960, as $25,240.87 and provided for additional damages on the same basis until the contract was performed. It was directed that the damages be deducted from the purchase price.

█ The guiding principle with respect to the calculation of the damages incident to the decree of specific performance, as we have seen, is to relate the performance back to the date set in the contract. Timely performance of the contract would result in the purchaser's receiving the rents and profits of the land but being denied the use of the purchase money, and a purchaser who seeks to recover rents and profits must permit an offset for his use of the purchase funds during the period that performance was delayed. █ In an early case this court held that a defendant in a situation like the one before us should be permitted to offset against the profits interest on the entire purchase price. (*Heinlen* v. *Martin* (1879) 53 Cal. 321, 343.) This holding is the overwhelming weight of authority. (See, e.g., *Pearce* v.

*Third Ave. Improv. Co.,* 221 Ala. 209 [128 So. 396, 400-401];
*Sladkin* v. *Greene,* 359 Pa. 528 [59 A.2d 105, 107]; 5 Williston on Contracts (rev. ed. 1937) 4003; Note 7 A.L.R.2d 1204, 1211-1212, 1218, 1222.)

The following decisions, which did not permit an offset of interest, failed to consider the rule set forth in *Heinlen* v. *Martin, supra,* 53 Cal. 321, 343, and are out of harmony with the principle that the parties should be placed in the same position as if the contract had been performed: *Lockhart* v. *J. H. McDougall Co.,* 190 Cal. 308, 313-314 [212 P. 1]; *Dennis* v. *Overholtzer,* 178 Cal.App.2d 766, 779 [3 Cal.Rptr. 193]; *Lifton* v. *Harshman,* 90 Cal.App.2d 180, 184 [202 P.2d 858]; *Brooks* v. *Fidelity Sav. & Loan Assn.,* 54 Cal.App.2d 130, 135 [128 P.2d 711]. *Lockhart* and *Brooks,* which are the earliest of the decisions, mistakenly relied upon section 1504 of the Civil Code, which provides that an offer of payment stops the running of interest on the obligation. That section has no relation to an offset against profits. In proceedings like the present one interest is allowed not because the contract created an obligation but because plaintiff seeks to recover profits and has thus made it necessary to relate performance back to the date set in the contract. Moreover, if a purchaser were permitted in equity to obtain profits for delay in performance and also invoke section 1504, he would be in a better position than if the contract had been timely performed. A court of equity will not permit a party to obtain such an undue advantage. *Lockhardt, Dennis, Lifton,* and *Brooks* are disapproved insofar as they are inconsistent with the views expressed above.

An exception to the rule permitting an offset of interest against profits is made insofar as the purchaser has, with notice to the seller, set aside money toward the purchase price in such a manner as to realize no use or benefit therefrom. (*Beckwith* v. *Clark,* 188 F. 171, 178-179 [110 C.C.A. 207]; *Emerson* v. *Fleming,* 246 Ill. 353 [92 N.E. 890, 893]; *Bostwick* v. *Beach,* 105 N.Y. 661 [12 N.E. 32, 33]; see Note 7 A.L.R.2d 1204, 1224-1225.) In this situation there is, of course, no danger that the purchaser will be able to obtain both the profits and the use of the purchase money. The holding in *Greenstone* v. *Claretian Theological Seminary,* 173 Cal.App.2d 21, 37 [343 P.2d 161], that an interest offset may be allowed even as to money which the purchaser set aside in escrow is disapproved.

It follows from these principles that the court erred

in not permitting an offset against the profits of interest on $130,000 for the seven-month period that $35,000 of the purchase money was kept in escrow and on the entire purchase price for the remainder of the delay. It was also error to award plaintiff interest on the $35,000 placed in escrow because, as we have seen, he would have been deprived of the use of that money had the contract been timely performed.

 The court properly allowed defendants an offset of $500 per month for the managerial services of Pericles. This was the reasonable value of his services as found by the court, and those services were involved in producing the profits sought by and awarded to plaintiff.

The judgment is reversed.

Traynor, J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.

The petition of plaintiff and appellant for a rehearing was denied September 4, 1963.