AUSTRALASKA CORPORATION, an Alaskan corporation, Appellant,

v.

SISTERS OF CHARITY OF the HOUSE OF PROVIDENCE IN the TERRITORY (NOW STATE) OF WASHINGTON, a Washington corporation, Appellee.

No. 479.

Supreme Court of Alaska.

Jan. 4, 1965.

Eben H. Lewis, of Robison, McCaskey & Lewis, Anchorage, for appellant.

Hugh G. Wade, of Wade & Conway, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

This is an action between two corporations wherein the one, Australaska Corporation, as plaintiff-appellant (hereinafter also designated Australaska), is seeking to recover an earnest money payment from the other, the defendant-appellee, sometimes referred to herein as Sisters of Charity. The appellant also demands damages from the appellee in the amount of $300,000 for the alleged breach of an option contract by the appellee as optionor.

The option contract is dated September 30, 1959, and relates to certain real property owned by Sisters of Charity and designated as Providence Hospital in the City of Anchorage. The original parties to the contract were the appellee and Cosmopolitan Development Corporation. The latter subsequently assigned its interest as optionee under the contract to the appellant. One de Lasala, who was the president of both Australaska and Cosmopolitan, represented his corporations in all their dealings with Sisters of Charity.

In August of 1959, Howard Hall, a real estate broker, with whom Sisters of Charity had listed the property in question for sale, contacted de Lasala and worked out the details of the option contract.[1] The purchase price for the property was fixed at $1,825,000. The optionee paid $15,000 at the time of signing the option contract to hold it open for one year. At the expiration of the year—October 2, 1960—if the optionee desired further time in which to decide whether to purchase the property, it was entitled to pay an additional $35,000 to the appellee and thereby extend the option to October 2, 1962. Both payments were to be applied on the purchase price of the property in the event the parties eventually entered into a contract of sale. Provision was also made that, if the optionee did not exercise the option to purchase, that any monies paid under the option agreement should be forfeited to the optionor as liquidated damages and in full and final settlement for nonperformance of the agreement to purchase.

At the instance of de Lasala, it was provided in the option contract that the optionor, Sisters of Charity, "warrants that there is no restriction as to the commercial use of the said property." The language of this provision of the contract was acceptable to both parties, but they later differed with respect to the interpretation of its legal effect and of their respective rights and obligations thereunder.

The property in question was at all times relevant to this action restricted by the zoning ordinances of the City of Anchorage to what is called an R–3 classification. In such a classification the property may be used only for multiple-family residences, rooming houses, hotels, public or private

---

1. The discussions and negotiations between Hall and de Lasala resulted first in an earnest money receipt signed by the two men on September 2, 1959. It is stated in the receipt that it is to be considered as only an option for which de Lasala was paying consideration in the sum of $15,000 on behalf of himself or his nominee. The earnest money receipt was superseded on September 30, 1959, by the more formal option contract drafted by counsel for Sisters of Charity.

nurseries, churches, public libraries, private lodges and clubs, hospitals and medical clinics and professional offices.

In negotiating for an option on the property, de Lasala entertained the hope of being able to lease the hospital building to a single state or federal agency such as the State Supreme Court, General Services Administration or the Federal Aviation Agency, who were then regarded as possible tenants for extensive office space.[2] He needed the option to provide time in which to find a tenant. He did not seem to be concerned about zoning restrictions at the time as he believed that, if a government agency could be found as a tenant for the building, the restriction would have been automatically changed to permit usage of the building for the purpose desired. After completion of negotiations for an option on Providence Hospital, de Lasala departed from Alaska, leaving it up to Hall, the real estate broker, to procure a tenant or tenants for the building.

As late as July or August 1960 no tenant had been found for the building; and it is then that de Lasala returned to Anchorage and claims that he learned for the first time that the property was zoned not merely as a hospital but had an R–3 classification. It was his opinion, as expressed in his testimony given by deposition, that the burden of obtaining a change in zoning to meet the warranty provision of the option contract against commercial use restrictions fell upon Sisters of Charity. In this connection he made two somewhat inconsistent statements: (1) that such a zoning change would not have to be effectuated until his second payment of $35,-000 on the contract was due; and (2) that such change was not required until Sisters of Charity delivered the property to Australaska.

The next move of de Lasala as president of Australaska was to try to prevail upon

Mother Judith, Provincial Superior (President) of Sisters of Charity, by letter dated August 11, 1960, for additional time of approximately fifteen months in order that he might negotiate with the city authorities of Anchorage to change the zoning of the property from R–3 to a business classification, B–2 or B–3. In this letter he mentioned that his attention had been drawn to the fact that on January 19, 1960, the city council of Anchorage had officially adopted a new zoning of R–3 for the area in which Providence Hospital was located, thereby denying use of the property for commercial purposes.[3] In this letter de Lasala did not claim that the zoning restrictions violated the warranty provision of the option agreement, although he did state: "In the normal course of events I could at this stage request the refund of deposit of $15,000.—"

Five days later, by letter directed to Cadwell Corrigan, Seattle counsel for Sisters of Charity, de Lasala indicated that he would not be interested in a two months' extension of time for the $35,000 payment due October 2, 1960, as offered him by Mother Judith. Instead, he asked for an extension until October 2, 1961, otherwise he "would appreciate refund of the deposit of $15,000.—"

On August 19, 1960, de Lasala sent another letter to Mother Judith in which he referred to an unidentified telegram, which he claims was sent by her, worded as follows:

"WE HAVE DECIDED TO TURN OVER ARRANGEMENTS OF DEAL TO PROVIDENCE HOSPITAL BOARD IN ANCHORAGE. BEST WISHES

"MOTHER JUDITH AND COUNCIL"

In the letter de Lasala went on to say that at the request of a Sister Benedict

---

2. Statehood had only recently been attained by Alaska, bringing with it new opportunities for investment of capital as de Lasala himself perceived.

3. It appears that the city council's action in January 1960 was not the adoption of a new classification for the area in which the hospital was located but rather the promulgation of a master zoning plan or map for the entire city.

(Procurator of Providence Hospital at Anchorage) he had attended a meeting of the "Hospital Board" at which it had been suggested and he had concurred that the $15,000 deposit be refunded to Australaska "and the option agreement be nullified." There was evidence produced at the trial that the board in question was composed of four laymen who had no authority to bind Sisters of Charity. One of the members of the board, Robert Baker, was apparently a vice-president of Australaska.

Nothing further occurred until November 4, 1960, when Corrigan informed de Lasala by letter that his recommendation to Sisters of Charity was that Australaska's $15,000 deposit to secure the option be forfeited, because Australaska had failed to exercise the option. It is to be noted that this letter was written about one month after the due date of the $35,000 payment mentioned in the option agreement.

The following June, Australaska filed suit demanding return of the $15,000 option money. On July 16, 1962, it filed an amended complaint, asking that the option contract be reformed to extend the time for payment of the $35,000 until one month after the zoning restrictions against commercial use have been removed; that the appellee, Sisters of Charity, be required to undertake the necessary procedures to remove the zoning restrictions against commercial use; and demanding that upon failure or refusal of the appellee to remove the offending restrictions on or before January 1, 1963, the appellant, Australaska, be awarded damages in the sum of $300,000 "suffered by reason of defendant's [appellee's] breach."

The appellee answered the amended complaint, denying that the warranty provision in the option agreement referred to zoning restrictions or that it had breached the agreement in any manner, or that any reformation of the agreement was proper, necessary or desirable; and alleging as one of its affirmative defenses that the initial $15,000 payment was forfeited by virtue of the appellant's failure to pay the additional $35,000 on or before October 2, 1960, or within any extended time granted by the appellee. In a counterclaim, the appellee asked that title to the property be quieted in itself as against any claim of the appellant.

The case was tried to the court without a jury and judgment was entered on January 22, 1964, denying recovery to the appellant and quieting title to the subject property in the appellee. This appeal followed.

The trial court made twenty-five findings of fact of which six are attacked, some in whole, others in part, in the appellant's specification of errors as not being supported by the evidence. Those findings of fact or pertinent portions thereof are as follows:

"XIV

"Neither of the parties anticipated any difficulty in securing whatever zoning change was required by the plaintiff [Australaska], and it was contemplated that the zoning regulations would be changed, if necessary, only after a tenant was secured and the option had been exercised. * * *[4]

"XV

"The plaintiff never requested or demanded that the defendant [Sisters of Charity] secure a change of zoning regulations * * *.

"XXII

" * * * It [Australaska] was not interested in purchasing without assured tenants.

---

4. The second sentence of finding No. XIV stated that "it was not contemplated that the defendant [Sisters of Charity] had any duty" to obtain a change in the zoning regulation "until after the option was exercised." Australaska contends that this portion of the finding was also erroneous in that it is a mixed conclusion of law and fact and without support in the record; however, it has not enlarged upon this specification of error in the argument portion of its brief and therefore we need not consider it. See Parks v. Brown, 368 P.2d 220 (Alaska 1962).

"XXIII

"When the tenants did not materialize, the plaintiff decided that it did not wish to go ahead with the deal unless it could get further time on an option basis. When the defendant would not give additional time, the plaintiff knew, without question, that the option expired by its own terms.

"XXIV

"The idea that the zoning regulation's existence was a breach of the defendant's warranty was an afterthought, so far as the plaintiff was concerned. The plaintiff was not actually interested in changing the zoning regulation prior to securing a tenant."

From our examination of the oral and documentary evidence in this case and from the inferences which may be reasonably drawn from the evidence, and bearing in mind the opportunity of the trial court to judge of the credibility of the witnesses, we conclude that none of the foregoing findings of fact contain such clear error as would require us to set them aside.[5]

■ Also under attack is finding of fact No. XIX which treats of the Anchorage board of laymen for Providence Hospital who met on August 19, 1960, and attempted to settle, but without authority to bind Sisters of Charity, the differences between the parties to this action. As to this finding, the appellant specifies as error the failure of the court to apply the principle of agency by estoppel to the conduct of the board. In support of its contention that the principle of estoppel should have been applied against Sisters of Charity, the appellant contends that, while the lay board may not have been granted authority to bind Sisters of Charity, the appellant, nevertheless, was misled as to the board's authority and relied thereon to its detriment.[6]

The appellant takes the position that it was entitled to rely upon the apparent authority of the lay board with which de Lasala met, especially where he immediately, by letter of August 19, 1960, communicated to Mother Judith the results of the meeting. The appellant claims that, since the letter was never answered, it was misled to stand by during a period in which the second option payment could have been made and the option thereby preserved. Such argument would have been persuasive if the appellant had tendered the $35,000 option payment or had shown that his own condition for purchasing an extension of the option had been met, namely, that it had obtained from the city authorities a change in the use classification of the property from R–3 to B–2 or B–3. Instead, the appellant made no tender of payment and prayed the court to cast upon Sisters of Charity the burden of procuring the change in zoning or of paying damages to the appellant in the amount of $300,000, in lieu of effecting a zoning change.

Lastly, in relation to the findings of fact, the appellant charges that the trial court erred in failing to take judicial notice of ordinance No. 105 of the City of Anchorage in view of the fact that in its finding No. XXV it had taken judicial notice of ordi-

---

5. For the rule on clear error as it applies to findings of fact by a trial court, see Civ.R. 52(a).

6. As authority for its claim that Sisters of Charity are estopped from denying the agency of the lay board, the appellant has cited us to three cases, none of which are helpful under the factual situation of the instant case. Jonas v. Leland, 77 Cal.App.2d 770, 176 P.2d 764 (1947), overruled on another point, Ellis v. Mihelis, 60 Cal.2d 206, 32 Cal.Rptr. 415, 384 P.2d 7, 13 (1963), simply holds at page 768 that the withdrawal of an option, irrevocable until the time set for its termination, is a nullity. In Halle v. Brooks, 209 Ala. 486, 96 So. 341 (1923), involving goods sold in the defendant's store, the court held that the person selling goods in the store had apparent authority. Sinclair Ref. Co. v. Lecrone Motor Transp. Line, 34 N.E. 2d 822 (Ct.App.1940), stands for the proposition that when an oil company sells through its manager to a service station there is created an agency by estoppel.

nance No. 1030 and subsequent amendments thereto.[7]

Ordinance No. 105, enacted in 1938, conveyed to Sisters of Charity the alley running through the property with the provision that the land thus conveyed should revert to the city, "when and if the same shall not be used for the erection and maintenance of a hospital." The appellant maintains that this ordinance should have been considered by the court for the alleged reason that it nullified the purposes of the option for the reason, we presume, though the appellant does not say so, that the property under the terms of the option agreement could not be used as a hospital by the appellant for the first twenty years of occupancy and therefore the appellant would not receive all the property covered by the option.

The appellant points out that under subdivision (a) (2) [a] of Civil Rule 43 the trial court may take judicial notice of duly enacted ordinances of governmental subdivisions without a request by either party and that the reviewing court under subdivision (a) (6) [c] of the same rule may in its discretion take notice of any matter specified in the rule which was not judicially noticed by the court below.

 Where, as here, the question of whether judicial notice of a particular matter should be taken has been addressed to the sound discretion of the trial court, the failure of the court to take such notice will not be disturbed on appeal in the absence of a clear showing of abuse of that discretion to the prejudice of the party complaining.[8] The appellant has made no showing of a clear abuse of discretion, nor does it ex-

plain why the trial court was under obligation to search through hundreds of ordinances on the chance of discovering one not related to zoning but nevertheless affecting the full enjoyment of the property by the appellant.[9] Furthermore, no occasion appears for this court to ascertain the ordinance in question and to apply it in this case for, as we shall point out later, the impedimentary effect of ordinance No. 105 upon the optioned property would not have to be removed until the appellant exercised the option.

The next four errors specified by the appellant are directed against certain conclusions of law based by the trial court upon its findings of fact. The first contention is that conclusion of law No. II, holding that none of the appellant's contemplated uses of the hospital property is prohibited by the zoning restrictions, conflicts with de Lasala's testimony that he contemplated use of the property by the appellant for offices, for a motel, or "for any purposes that I wanted, bar heavy industry, light industry." Since the real issue in this case, as we view it is whether Sisters of Charity had a duty to secure a change in the zoning regulations before the appellant exercised its option, we do not deem it necessary to decide at this point the correctness of conclusion of law No. II.

 So we proceed to the next conclusion assailed by the appellant—No. III—which raises the issue squarely as follows: "The defendant [Sisters of Charity] had no duty to secure a change of the zoning regulations in any event unless and until the option had been exercised." While there is no time stated in the option agreement for

---

7. Ordinance No. 1030 of the City of Anchorage, adopted September 19, 1952, and amended in 1958 and 1960, is the basic zoning ordinance of Anchorage. It lists the various use districts, including those designated R–3, and sets forth the ramification of uses permitted by R–3 zoning, such as multiple-family dwellings, hotels, hospitals, and medical clinics and professional offices.

8. Gunsolus v. City of Fairbanks, Opinion No. 203, 391 P.2d 13 (Alaska 1964); Crume v. Crume, 378 P.2d 183, 186 (Alaska 1963); Gelberg v. Consolo, 51 Cal.App.2d 516, 125 P.2d 74 (1942); Walsh v. Public Serv. Co., 92 N.H. 331, 30 A.2d 494, 496 (1943); Wickham v. Belveal, 386 P.2d 315, 319 (Okl.Sup.Ct. 1963).

9. See Walsh v. Public Serv. Co., supra note 8.

removing zoning restrictions, de Lasala himself stated that there was no duty to have a change of zoning made until the time for delivery arrived.[10] Common sense dictates that it would be extremely unlikely that the parties intended for the property to be made ready for immediate delivery, especially where the appellant had indicated that a prerequisite to the exercise of the option was the finding of a tenant for the property and none had been found. On this point we are in agreement with the rule set forth in the cases cited in the margin that, subject to exceptions not relevant here,[11] the optionee cannot complain of the optionor's defective title until the optionee exercises the option and tenders performance.[12] Inasmuch as the appellant has failed to exercise its option to purchase Providence Hospital, it is in no position to complain that Sisters of Charity has not procured a zone change for the property.

■ Conclusion of law No. IV contains the statement that the appellant got everything to which it was entitled under the terms of the option contract. This, the appellant contends, is not so, because it did not get an option to commercially unrestricted property as called for by the warranty clause in the option. In arguing thusly the appellant disregards the fact that there was evidence to the effect that it had knowledge through its agent, de Lasala, of the zoning restrictions at the time the option agreement was executed.

As for the appellant's claim that its bargain was further impaired by the restriction of ordinance No. 105, this would have to be based on an assumption that the City of Anchorage could not have been induced to lift the restriction by the time of the exercise of the option.

Conclusion of law No. V states: "The fact that the plaintiff [the appellant Australaska] attempted to bargain for additional time does not enlarge its rights." The appellant maintains that this conclusion is in error for the reason that the appellee, Sisters of Charity, was estopped by certain of its acts from terminating the option agreement without returning to the appellant the $15,000 paid for the option. The appellant reasons that, because the appellee's lay board advised de Lasala that they thought he was entitled to the return of his $15,000 and because de Lasala relayed this information to the appellee by letter of August 19, 1960, stating that he was terminating the option and demanding the return of the money and because the appellee did not respond to this letter except to notify the appellant several months later and after the due date of the second payment on the option that the $15,000 was forfeited for failure to exercise the option, the appellee should not be permitted to assert that the option agreement had come to an end.

The appellant presents in its brief four cases[13] from other jurisdictions which, it claims, support the claim of estoppel in this

---

10. In Johnston v. Landucci, 21 Cal.2d 63, 130 P.2d 405, at 409, 148 A.L.R. 1355 (1942), the California Supreme Court observed:

"It is, of course, proper when a contractual provision is ambiguous, for the courts to look at the subsequent conduct of the parties to ascertain how they construed the provision in question. The contemporaneous and practical construction of a contract by the parties is strong evidence as to the meaning of equivocal provisions. [Citing cases.]"

11. See Cole v. Atkins, 69 Ariz. 81, 209 P.2d 859, 861 (1949); Ford v. White, 179 Or. 490, 172 P.2d 822, 825 (1946); Soules v. Cox, 53 Wash.2d 598, 335 P. 2d 476 (1959); Annot., 109 A.L.R. 442,

465–66 (1937); 1A Corbin, Contracts § 272 at 579 (1963).

12. Auslen v. Johnson, 118 Cal.App.2d 319, 257 P.2d 664 (1953); Aspinwall v. Ryan, 190 Or. 530, 226 P.2d 814, 818 (1951).

13. The cases offered by the appellant in support of its claim of estoppel in connection with its objection to the trial court's conclusion of law No. V are: Jonas v. Leland, 77 Cal.App.2d 770, 176 P.2d 764 (1947), overruled on another point, Ellis v. Mihelis, 60 Cal.2d 206, 32 Cal.Rptr. 415, 384 P.2d 7, 13 (1963); Holden v. Efficient Craftsman Corp., 234 N.Y. 437, 138 N.E. 85 (1923); Johnson v. Noles, 224 N.C. 542, 31 S.E.2d 637 (1944); Schaeffer v. Coldren, 237 Pa. 77, 85 A. 98 (1912).

case. We have examined the cases and find their holdings on the issue of estoppel against the optionor inapplicable to the situation at hand. We say this for the reason that in each of those cases it was a fact that the optionee was seeking specific performance of the option agreement and had tendered payment or was ready and willing to otherwise perform on his part; whereas in the instant case the appellant does not want specific performance of the option agreement but appears to be interested only in salvaging as much as possible out of a bargain that proved to be unwise when it was unable to obtain a tenant for the optioned property.

For the reasons stated, we find no error in any of the trial court's conclusions of law discussed above.

The final issue raised by the appellant is that the trial court mistakenly treated the agreement between the parties as a contract for the sale of real estate instead of as a contract for an option. The distinction is important, the appellant seems to think, because it wants us to apply the doctrine of anticipatory breach against the appellee and believes that this can best be done if the contract between the parties is not treated as a real estate contract in which the property involved is the thing of value, but is treated rather as an option contract in which the thing of value is the right flowing from the contract.

In this connection the appellant advances the argument that the silence of the appellee with regard to the letter of August 19, 1960, sent (by de Lasala to Mother Judith) immediately after the lay board meeting, constituted some sort of anticipatory repudiation of the option contract by the appellee and that this misled the appellant until it was too late to make the next option payment of $35,000. This argument is not persuasive because the appellant does not now desire to pay the $35,000 nor does it allege that it was ready and willing to pay the money at any time after the execution of the option agreement. We conclude as did the trial

court that the appellant simply did not want to go ahead with the contract because it had not been able to find a tenant for the property on which it had taken the option.

Judgment affirmed.