Harold I. RICHARDSON, Appellee,

v.

A. T. VAN DOLAH, Appellant.

No. 24048.

United States Court of Appeals, Ninth Circuit.

July 21, 1970.

James K. Tallman (argued), Wilson & Wilson, Anchorage, Alaska, for appellant.

W. C. Arnold (argued), Anchorage, Alaska, for appellee.

Before BARNES, ELY, and HUFSTEDLER, Circuit Judges.

ELY, Circuit Judge:

This appeal arises from a judgment rescinding two written agreements, a conditional sale contract and a mining sublease, between appellant Van Dolah and appellee Richardson.[1]

The conditional sale agreement provides for the sale of certain real and personal property situated in the Palmer Recording District of the State of Alaska. The real property consists of unpatented placer mining claims, and the personal property consists of undescribed mining equipment located on the claims. Upon the execution of the agreement, appellee was to pay $40,000 cash and tender a $10,000 promissory note payable fifteen days from the date of the agreement. One-half of this $50,000 was to be applied toward the $150,000 price of the real property and one-half toward the $150,000 price of the personal property. The remaining $125,000 owed for the real property was to be paid in monthly installments of $1,500 plus 5% interest during the next nine years. An identical schedule was established for the payment of the remaining $125,000 owed for the personal property.

Upon payment of the initial $50,000, appellee was to acquire possession of the real and personal property and the right to all ores mined and proceeds accruing from his use of the property. The appellant had a first choice option on all the gold processed from the claims and was to receive ten percent of the net proceeds from certain oil, gas, and hydrocarbon leases on the property. Title to the real and personal property was to remain in the appellant "until all the terms, covenants, agreements and conditions of [the] Agreement [were] fully performed by the [appellee]." At that time a "quitclaim Deed of conveyance" to the mining claims and a "Bill of Sale" to the personal property were to be transferred from escrow to the appellee.

Appellant covenanted that she was the owner of the claims, that the required assessment work had been performed, and that the claims were valid and in good standing, free and clear of all liens, encumbrances, and claims of any party. A similar covenant related to the personal property. The appellee agreed to perform all work necessary to insure that the unpatented placer mining claims did not revert to the state or federal government or to any individual, corporation, or entity. Finally, the agreement stated that the parties had entered a leasing agreement as of the

---

1. The District Court had diversity jurisdiction under 28 U.S.C. § 1332. Our jurisdiction is based on 28 U.S.C. § 1291.

date of the conditional sale agreement and that the violation of either agreement would be a violation of the other agreement.

In the mining sublease the appellant agreed to "lease, let and demise" certain property to appellee. Some of the property was held by appellant under a leasing agreement with a third party; the remainder was supposedly owned outright by appellant. Appellee was given the right to mine and remove mineral ore from the property. He agreed to do the required assessment work and assumed the obligation of beginning extensive development work on May 1, 1968. The appellant was to receive a royalty of approximately ten percent of the net proceeds from the property and reserved the right to terminate the lease if the appellee failed to cure any default within a specified period. Finally, the agreement provided that the appellant and appellee had entered a conditional sale agreement as of the date of the sublease and that any violation of either agreement would be a violation of the other agreement.

About four months after the two agreements had been signed and appellee had taken possession, various defects were discovered in the titles to the claims. Richardson had apparently become pessimistic about his prospects under the agreement, and his attorney uncovered the alleged defects. Richardson brought the alleged defects to Van Dolah's attention, but they were not immediately cured. Richardson then instituted his suit.

The District Court found that the conditional sale agreement and the sublease were executed on or about June 26, 1967, that the agreements were interlocking in their terms, and that the sublease was for the same consideration as, and an integral part of, the conditional sale agreement. By the express terms of the conditional sale agreement, appellant was found to have covenanted that she was the owner of the unpatented mining claims and that they were in good standing and valid. By her agreement to lease the property under the sublease, appellant was found impliedly to have covenanted that she had good right and title to make the sublease.[2] It was found that the appellee went into possession of the property in reliance on these covenants of title and had performed all of his obligations under both of the agreements up to the time of trial.

The court found that prior to learning of the title defects which form the basis for this suit, the appellee went into possession of the property, paid appellant $62,000 toward the total consideration of $300,000, and expended $28,169 in rehabilitating the property, repairing the personal property, and preparing to commence placer mining.

The court further found that the appellee learned of the title defects on or about October 10, 1967, and instituted

---

2. This determination was correct. Although we have found no Alaskan decision of recent vintage which deals with the point, our analysis of the lease is aided by Halla v. Rogers, 176 F. 709 (9th Cir. 1910), an appeal from the then United States District Court for the Second Division of Alaska. *Rogers* involved a lease with terms which were identical, for our purposes, to those in the sublease before us now. As with the sublease here, the *Rogers'* lease conveyed an unpatented placer mining claim for a term of years, under covenants on the lessee's part to do the annual assessment work, to mine the claim continuously during the term on pain of forfeiture, and to pay royalties based on the amount of minerals extracted. The court there held that the lease contained an implied covenant that the lessees could freely mine the property and would become the owners of the minerals upon extraction:

"The instrument * * * contained on the part of the [lessors] the implied covenant of the quiet enjoyment during the term, and, of course, that [lessors] would not interfere with [the lessee's] possession, work, and extraction. [Lessors] impliedly covenanted that [lessees] might, without let or hindrance by them, have the full term of the lease for exploration and extraction, and also that immediately upon extraction the minerals should become the property of [lessees]." *Id.* at 713.

suit on November 11, 1967, after the appellant failed to take corrective action. The court found that there was a substantial failure of consideration because incurable title deficencies prevented the ground from being mined as a block except by willful trespass on the public domain. The use of the mining equipment was thus found to be frustrated and its value largely destroyed because it could be moved elsewhere only at great expense.

The District Court, finding that the defects of title were incurable and that they constituted a substantial failure of consideration, decreed rescission. The decree also directed that Van Dolah should refund to Richardson the $62,000 that the latter had paid toward the $300,000 purchase price of the property and that Richardson should also receive $28,169, which he had expended for the benefit and preservation of the property, and his costs of suit. Van Dolah was allowed no credit for the rental value of either the real or personal property during the eighteen-month period between June 26, 1967, when Richardson took possession, and January 10, 1969, when the decree was entered.

Pending restitution, appellee was granted an equitable lien on all of appellant's interest in the real and personal property described in the sale agreement and the right to retain possession of the property which was the subject of both the sale and lease agreements until the lien was discharged. When Van Dolah was unable to pay the monies specified by the decree, the court ordered foreclosure. At the foreclosure sale, Richardson purchased the whole of Van Dolah's interests for the amount of the lien. Thus, for his out-of-pocket costs of $90,621, almost a third of which was spent in improving the property, Richardson acquired all of Van Dolah's interest in both the real and personal property, for which $300,000 was to be paid under the sale agreement, and in the property covered by the sublease.

Appellant presents several arguments in connection with her basic contention that the contracts should not have been rescinded. Although we reject all but two of these arguments, we mention them briefly. The first is based on the fact that the conditional sale agreement contemplated the transfer of a "Quitclaim Mineral Deed" which would convey only whatever "right, title, and interest" Van Dolah had in the placer claims. She thus invokes the rule that when a vendor agrees only to convey all of his right, title, and interest in certain property, the vendee may not complain of title deficiencies as long as he receives all of the interest that the vendor possesses. *See, e.g.,* Talman v. Dixon, 253 N.C. 193, 116 S.E.2d 338 (1960). Van Dolah argues that her contracted covenants of title are rendered ineffective by the application of this rule.

■■ We agree with appellant that the deed and the sale agreement should be read together. Tjosevig v. Donohoe, 262 F. 911, 916 (9th Cir. 1920). This approach, however, leads to a result contrary to that urged by appellant. While the agreement contemplated the ultimate delivery of a quitclaim deed, it also contemplated an interim period during which the covenants of ownership were operative. And while title to the claims themselves was to remain in the seller during the nine-year escrow period, title to the ore was to vest in the buyer upon its removal from the earth. Thus, for some nine years, Richardson required assurance that Van Dolah had the right and the power to transfer title to the extracted minerals. This assurance was provided by the covenants made by the seller in the sale agreement. Since these covenants are not inconsistent with the provision for ultimate conveyance by quitclaim deed, the fact that a quitclaim deed was to be delivered at the close of escrow did not negate the effectiveness of the covenants during the escrow period.

■ We also reject Van Dolah's alternative argument that, assuming the covenants are given effect, they do not become operative until the close of escrow. Our attention is directed to the typical

contract for the sale of land. In the typical situation, however, it is because the vendor's present ownership of the land is not critical that title to the land, which is not conveyed until the close of escrow, is only required to be a good title as of the close of escrow. *See* McCubbin v. Urban, 247 Iowa 862, 77 N. W.2d 36 (1956). Here, the vendor's present ownership of the minerals was critical. Her title to the minerals was to pass when the minerals were extracted, and since it was clearly contemplated that the vendee would commence mining operations upon the claims when he assumed their possession, he was entitled to assume that the seller's covenants of title were effective from the beginning. *See* Fouch v. Rollins, 146 F.Supp. 87, 90, 16 Alaska 545 (D.Alaska 1956).

■ With respect to those claims covered by the mining sublease, Van Dolah, as lessor, relies on the general rule that a tenant in peaceful possession is estopped to question the title of his landlord. This doctrine is, of course, designed to prevent a tenant from defending a suit for rent by challenging his landlord's right to put him into possession. Hancock Oil Co. of California v. *Independent Dist. Co.*, 24 Cal.2d 497, 150 P.2d 463 (1944). Appellant has referred us to no authority, and we have found none, that applies the rule to an action for rescission which is instituted by a tenant claiming that title defects will prevent his reaping the benefits of his lease agreement. On the other hand, Powell v. Hammon Consolidated Gold Fields, 8 Alaska 153 (1929), clearly implies that the rule is not applicable to suits for rescission.[3] In the lease agreement here, as in the sale contract, title to the minerals was to pass upon extraction. Thus, Richardson would receive no benefit from the leasehold if

Van Dolah were unable to convey title to the minerals whenever, during the leasing period, such minerals might be removed.

■ Van Dolah is correct, however, in arguing that if Richardson had actual notice of any of the alleged title defects when the agreement was executed, then neither contract could be rescinded because of those defects. The trial court refused, on the basis of the parol evidence rule, to accept evidence designed to prove that Richardson had actual notice of some of the defects before entering into the written agreement. This was error, since, under Alaska law, a purchaser is not entitled to rescission if he had actual notice of title defects before signing the agreement. Australaska Corp. v. Sisters of Charity, 397 P.2d 966, 972 (Alaska 1965). The trial court should have received this evidence and given Richardson the opportunity to show a lack of actual notice. We do not reach the question of whether the court's ruling may have been harmless error because Richardson allegedly had actual notice of only a few of the defects. Since there must be a new trial for reasons related to Van Dolah's final contention, all aspects of the issue of actual notice will be considered at that trial.

■ We reject the argument that appellee cannot rescind the agreement because all of the alleged defects were disclosed in public records and the appellee had constructive notice thereof. *See* Seeger v. Odell, 18 Cal.2d 409, 115 P.2d 977, 980 (1941). To accept appellant's argument in this respect would be to say that a purchaser could never contractually require a vendor to deliver, at the end of the contract period, a title free from record defects.

3. In *Powell* the landlord had sued for royalties and minimum annual payments due under leases of certain mining claims in the Nome Recording District of Alaska. As a defense the tenant challenged the right of his landlord to lease the property. The court, rejecting this defense, stated the general rule that a tenant may not question the title of his landlord. The court went on to say: "So long as the defendant was not evicted, and no threat was made to evict, the defendant had nothing of which to complain. No fraud or mistake, and *no cause for a rescission of the contract is alleged*." *Id.* at 162 (emphasis added).

Appellant vigorously challenges the validity of the trial court's finding that the title deficiencies were so extensive and irreparable that a substantial failure of consideration resulted. The court found that some of the claims were wholly or partially owned by parties other than appellant and that others had never been properly segregated from the public domain. Those claims wholly or partially owned by parties other than appellant were claims wherein persons other than appellant were owners of record or wherein the appellant's title was based on improper proceedings to forfeit the interest of a co-owner. Those claims improperly segregated from the public domain were claims for which the location notice had not been recorded, or wherein the location was made by an agent who had not recorded the requisite power of attorney, or by a single claimant who knowingly exceeded the maximum allowable acreage. In some cases, the title deficiencies subjected the claims to the potential of challenge on more than one of the above grounds.

The court found that the defects were extensive. Of the 70 claims sold to appellee under the conditional sale agreement, 39 were found to have at least one of the defects noted above, and 20 of these were found to have two or more such defects. The claims subject to challenge encompassed 1020 acres of the total of 1940 acres sold under the agreement. Of the 234 claims which were leased to appellee under the sublease agreement, 187 were found to have at least one defect, and over 40 of these were found to have two or more such defects. The claims under the lease which were subject to challenge encompassed 4540 of the 6280 acres leased.

The court explicitly found that the failure to segregate certain of the claims from the public domain prevented the appellee from mining the ground as a block except by willful trespass on the public domain. While the court made no explicit finding on the point, we may assume that the partial or complete ownership of the other challenged claims by third parties similarly impeded the appellee's freedom to develop the claims.

Although Van Dolah offered to perfect her title both to the claims that had been improperly segregated from the public domain and to the claims that were possibly subject to the interests of third parties, the court found that she was foreclosed from taking the necessary remedial action. Underlying its determination that the claims improperly segregated from the public domain could not be perfected was the court's belief that the lands had been withdrawn from location by the Secretary of the Interior. The determination that most of the claims subject to the interests of third parties could not be perfected derived from the court's opinion that Van Dolah could never "deprive her co-owners of their interest by relocating in her sole name." We shall discuss these conclusions separately.

We have reached the conclusion that there was error in the determination that the claims improperly segregated from the public domain could not be perfected. The "Notice of Application for Withdrawal of Unreserved Lands," on which the trial court relied, was promulgated by the Commissioner of Indian Affairs for approval by the Secretary of the Interior. 33 Fed.Reg. 18591 (1968). By its terms it was an application for the withdrawal of all unreserved public lands in Alaska "from selection, settlement, location, [and] sale and entry under the public land laws." Since the trial court had determined that the claims segregated from the public domain were "null and void," it apparently concluded that these claims were "unreserved" public lands within the meaning of the Application, that appellant could do nothing to remedy the defects, and that appellee would be trespassing on the public domain if he attempted to mine these claims.

On January 22, 1969, the day that the court concluded its final hearing in the case, the Public Land Order issued pursuant to the Notice of Application was filed by the Secretary of the Interior, 34

Fed.Reg. 1025 (1969). This public order withdrew unreserved lands but expressly excluded from its effect "locations for metalliferous minerals."

The trial court, of course, had no way of knowing that the ultimate order issued pursuant to the Application would exclude locations for metalliferous minerals. The Application had included this category. Thus, the court's conclusion that the claims improperly segregated from the public domain could not be perfected was based on the then understandable, yet inaccurate, assumption that these claims would be withdrawn before they could be perfected.

Appellee offered no other evidence that would suggest that the appellant was foreclosed from perfecting her title to those claims that had not been segregated effectively from the public domain. There was no suggestion that third parties had entered the land to locate placer claims on the property. Instead, the appellee had maintained possession of the property and had employed a watchman to protect it. Moreover, there was no suggestion that it would be physically impossible to perfect the defective claims within a reasonable time. Appellee's counsel conceded that he had offered no evidence on the question of the physical feasibility of relocating the claims. Appellant, on the other hand, testified that the defects relating to the property covered by the conditional sale agreement could be corrected in "approximately a week" and offered the testimony of an experienced miner that it would take "approximately a week" to accomplish the relocation. The same miner estimated that the work required to cure the larger number of defects plaguing the subleased claims could be accomplished in "a month to six weeks." This testimony was uncontroverted, although the appellee did suggest, during cross-examination, that then-existing snow conditions would make difficult the task of relocating the claims.

Moreover, the fact that these claims were not withdrawn by the United States also upsets the court's finding that "[i]nvalid claims are interspersed with valid ones to such a degree that the ground cannot be mined as a block except perhaps by willful trespass on the public domain." Since the final order withdrawing lands from entry did not apply to locations for metalliferous minerals, the appellee need not fear that his mining operations, either on these claims or others, will require that he trespass on the public domain. There was no suggestion that appellant's restaking operations will prevent appellee from working the claims that need to be relocated. Hence, the appellee is not precluded from mining those claims that were improperly segregated from the public domain.

■ The court's conclusion that the claims subject to the interests of third parties could not be perfected was also inaccurate. Although the court found that the appellant could not deprive her co-owners of their interests by relocating in her sole name, it failed to rule out the possibility that the appellant could have acquired the interests of her co-owners. Further, with regard to these outstanding claims of third parties, no showing was made that the potential threat would ever materialize. As far as most of the claims are concerned, the threat may be viewed as improbable. This is because the appellant's title to this property was partly based on inadequate proceedings to advertise out co-owners who, by failing to participate in the required assessment work, had already indicated their disinterest in the property. Nevertheless, assuming that the interests of these parties were revived, the potential threat would still be applicable to only a small number of the claims. Appellant should be afforded the opportunity to acquire the interests of the owners of these claims, as well as the interests of the owners of the few claims in which appellant apparently has no interest.

We think it likely that the trial court would have reached a different conclusion had it realized that the appellant

was not foreclosed, either by the public land order or by her apparent inability to relocate claims in her sole name, from perfecting her title to the lands in question.

■■■■ Support for our conclusion that a reasonable time should be allowed in a case such as this is found in the general rule that, when time is not of the essence, a vendor will be allowed a reasonable time, even beyond the date on which title is to be delivered, within which to perfect his title. The rationale is that if title defects can be cured within a reasonable time, there is no substantial failure of consideration. When a contract expressly provides that title shall be conveyed on a certain date and the issue is whether the vendor's failure to secure a good title by that date entitles the vendee to rescind, courts have resolved the issue by determining whether "time is of the essence" of the agreement. If time is of the essence, the vendor's inability to perform on the specified date promised is critical and he will not be allowed additional time to perfect his title. In such a case any delay is unreasonable and constitutes a substantial failure of consideration. If, on the other hand, time is not of the essence, equity will not decree rescission unless it is shown that the vendor will be unable to acquire good title within a reasonable time. See, e.g., Fruhling v. Ellis, 143 Colo. 162, 352 P.2d 656 (1960). Here, neither the conditional sale contract nor the sublease fixed a definite time within which Van Dolah was required to cure any defects of title.[4] We have therefore concluded, in the light of all the equitable considerations which bear upon this particular case, that the trial court should not have entered a decree of rescission without first affording to the appellant a reasonable opportunity to perfect such of her titles as were found to be defective.

Eventually it may be appropriate to award damages to appellee for injury incurred as a result of the delay in perfecting title. It would be possible, of course, to set off these damages against payments required to be made by appellee. On the other hand, the court may find it appropriate to award appellant the reasonable rental value, if any, of the unchallenged claims for the period during which appellee has failed to perform the required development work.

■■■ Should the appellant finally be unable either to show actual notice on Richardson's part or to perfect her titles to such an extent as to avoid a decree of rescission, she should nonetheless be allowed to reclaim her personal property.

---

4. We have not overlooked the fact that a clause in the contract does state that "time is of the essence." We believe, however, that this clause is not applicable to the question whether the vendor should be allowed a reasonable time within which to cure defects of title. The paragraph that contains the clause relates to the duties of both the buyer and the seller, but is it principally directed to the buyers obligation to pay monthly installments on the balance of the purchase price. A specific period of ten days is set out within which the buyer must pay the amount due or forfeit his interests under the agreement. Thus, the "time is of the essence" clause in this paragraph is, in our opinion, intended to define the obligations of the appellee with respect to the payment of the purchase price rather than the ability of the appellant to transfer a good title before the close of the escrow period.

This was the construction implicitly given to such a clause in Fruhling v. Ellis, 143 Colo. 162, 352 P.2d 656 (1960). There the clause was also contained in a paragraph that delineated the responsibilities of the buyer as to the payment of the purchase price. The clause in Ellis, as here, was followed by language which gave the seller the right to forfeit the buyer's interests under the contract if the buyer did not respond to a default notice within fifteen days. The court held that since the "time is of the essence" clause did not relate to the question of whether title had to be perfected on a certain date, it was inapplicable. According to the court, "the fact that the contract provides that 'time shall be of the essence of this agreement' adds nothing to an agreement which fixes no 'time' for the doing of an act." 352 P.2d at 659.

In addition, she should be allowed to recover a reasonable rental, if any, for the period of its use by appellee, and to recover a reasonable rental for whatever use, if any, appellee might have made of that portion of the real property whose ownership by appellant is not questioned.

Reversed and remanded.[5]

---

5. We previously stayed, pending our disposition of the appeal, the District Court's confirmation of the Marshal's sale of the property, under foreclosure, to the appellee. Richardson thereafter filed a motion to vacate the stay order. That motion is now denied. Also, since we vacate the basic judgment, all foreclosure proceedings which have occurred pursuant thereto are of no force and effect, and all Orders which the District Court has made in connection with such proceedings are, of course, vacated.