[No. B192857. Second Dist., Div. Five. Oct. 25, 2007.]

ELIAS REAL ESTATE, LLC, Plaintiff, Cross-defendant and Respondent, v. PO-TSUNG TSENG et al., Defendants, Cross-complainants and Appellants; W & J FOX REALTY, Cross-defendant and Respondent.

426

**COUNSEL**

Law Offices of Roger C. Hsu and Vincent Chan for Defendants, Cross-complainants and Appellants.

Ecoff, Law & Salomons and Lawrence C. Ecoff for Plaintiff, Cross-defendant and Respondent.

Wasserman, Comden & Casselman, Mark S. Gottlieb and I. Donald Weissman for Cross-defendant and Respondent.

OPINION

**ARMSTRONG, Acting P. J.**—Defendants and appellants are four brothers (the Tseng Brothers) from China who all work for the family textile business in one capacity or another. The Tseng Brothers own a piece of commercial real property in San Pedro (the Property) as tenants in common, which property is the site of the family's United States operations—the importation and distribution of clothing.

One of the four brothers, Arthur, has lived in southern California since 1983 and is a naturalized United States citizen. He is the president of the California company which imports the merchandise manufactured by the family business overseas. This company leases the Property from the Tseng Brothers. The other three brothers live and work abroad, in Shanghai and Taiwan.

In August 2004, Arthur met with Frank Kim, a licensed real estate salesperson employed by a company owned by licensed real estate broker William Fox. Arthur entered into a written listing agreement with defendant Fox Industrial Realty (Fox Realty) to sell the Property. Although Fox Realty learned that Arthur was not the sole owner of the Property, it did not request, and did not obtain, written authorization which would permit Arthur to act on behalf of the other Tseng Brothers, but relied on Arthur's assurances that he was authorized by his brothers to sell the Property.

Elias Real Estate, LLC (Elias), learned that the Property was for sale through its broker, Gabriel Weiss. Like Fox Realty, Elias learned that Arthur was not the sole owner of the Property, and knew as well that an agent's authorization to sell real property must be in writing. Elias did not request that the Tseng Brothers provide written authorization, but relied on Arthur's representations that he was authorized to act on behalf of his brothers.

On October 1, 2004, after several rounds of offers and counteroffers, Elias signed a counteroffer submitted by Arthur. Upon receiving the signed counter-offer, Arthur immediately called his brothers "to verify" whether they still wanted to sell the Property. Arthur then informed Fox Realty that the Tseng Brothers had decided not to sell the Property. Plaintiff sued the Tseng Brothers for specific performance; the Tseng Brothers cross-complained against Elias for declaratory relief, and against Fox Realty for declaratory relief, negligence and indemnity. The Tseng Brothers' principal defense to the

specific performance action was that the non-United States-based Tseng Brothers had not signed the purchase agreement, nor given written authorization for Arthur to act as their agent in the sale of the Property, and thus their agreement to sell the Property was unenforceable because it was not in writing as required by the statute of frauds.

After a bench trial, the trial court found that Arthur was in fact authorized to sell the Property on behalf of his brothers, that the authorization was in writing, and that the statute of frauds was thus satisfied. The court also found that the Property was held in partnership by the brothers, that Arthur was the managing partner, and that the sale of the Property was in the ordinary course of the partnership's business, thus obviating the need for written authorization. The court awarded specific performance to plaintiff. In addition, on the Tseng Brothers' cross-complaint against Fox Realty for broker negligence and indemnity, the trial court entered judgment in favor of Fox Realty. The Tseng Brothers filed a timely notice of appeal.

## CONTENTIONS

The Tseng Brothers challenge the judgment on three separate grounds: (1) No evidence was presented concerning either the value of the Property or Elias's ability to obtain financing to purchase the Property, so the remedy of specific performance was improperly ordered; (2) because the Tseng Brothers' appointment of Arthur to act as their agent in the sale of the Property was not reduced to writing, the statute of frauds prevents enforcement of the contract of sale; and (3) the faulty advice of Fox Realty's employee, Mr. Kim, regarding the binding effect of the counteroffer requires reversal of the judgment.

### 1. *Judgment in favor of Elias*

Because the statute of frauds is determinative of the judgment in favor of Elias, we begin our discussion with an analysis of the trial court's resolution of that issue.

At trial, the Tseng Brothers defended this lawsuit based on the affirmative defense of the statute of frauds, which is codified in Civil Code section 1624. The portion of the statute which pertains to this case provides:

"The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent: [¶] . . . [¶]

"(3) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; such an agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged." (Civ. Code, § 1624, subd. (a)(3).)

Only Arthur signed the counteroffer which, when accepted by Elias, became the purchase agreement; Arthur's three brothers, the co-owners of the property, did not agree in writing to the sale. Elias argued at trial that Arthur was authorized to act as agent for his brothers. However, Civil Code section 1624, subdivision (a)(3) makes clear that any such authorization must be in writing in order to bind the nonsignatory sellers.

The record establishes that Arthur represented, both orally and in writing, that he was authorized to sell the property. However, no written authorization to sell was ever produced at trial, and the only testimony on the issue was that the Tseng Brothers did not sign a written authorization. Notwithstanding the complete absence of evidence of written authorization, the trial court found that the purchase agreement was "entered into with the express authorization and consent, both orally and in writing, of all four Defendants."

■ Elias makes no citations to the record on appeal to support the trial court's finding that the Tseng Brothers executed a written authorization. Instead, it references Evidence Code section 1521, which provides that the content of a written document may be proved by otherwise admissible secondary evidence. Elias states: "The cases are legion that oral testimony may be presented to establish the content of lost or destroyed documents." However, there was no evidence of a lost or destroyed document. Rather, there was absolutely no evidence admitted at trial that the Tseng Brothers executed a written authorization with respect to the sale of the Property. Elias contends that the "trial court's inference that this authorization was given in writing was reasonable." ■ To the contrary, when there is an absence of evidence of a positive fact, one cannot reasonably infer the existence of that fact.

Elias argues that, in any event, the authorization was not required to be in writing "because the sale was within the scope of Arthur's authority in running the business." Our Supreme Court considered a similar argument in *Ellis v. Mihelis* (1963) 60 Cal.2d 206 [32 Cal.Rptr. 415, 384 P.2d 7] (hereafter *Ellis*).

In *Ellis*, two brothers owned two ranches, one in Stanislaus County operated by Pericles Mihelis and the other in Santa Clara County operated by Elias Mihelis. "In 1957 the brothers decided to sell the Stanislaus County ranch and agreed that Pericles should handle negotiations for the sale and submit any prospective deals to Elias. Pericles listed the property with a real estate broker in Stanislaus County, George Moreno, telling him that he was the owner." (*Ellis, supra,* 60 Cal.2d at p. 211.)

"On April 17, 1958, Pericles and Moreno . . . prepared an instrument using a printed form denominated 'Agent's Deposit Receipt.' The instrument, bearing the above date, acknowledged receipt of $5,000 as a deposit on account of the purchase price of the described property and provided for a total purchase price of $165,000, the balance to be paid $30,000 within 30 days from date and $130,000 by note bearing interest at 5 per cent per annum, payable in specified installments, and secured by a deed of trust and crop mortgage." (*Ellis, supra,* 60 Cal.2d at pp. 211–212.)

"On May 2, 1958, Pericles, Elias, [the buyer], and Moreno met at the ranch. Until then, neither [the buyer] nor Moreno knew that Elias had an interest in the property. Pericles stated that he had changed his mind and did not want to sell, that he was not 'going through with the deal,' that as a result of a frost occurring a few days earlier which had damaged some vineyards in the area but left his grapes unharmed his crop had become too valuable for him to sell the ranch, and that he could get the same price after the harvest." (*Ellis, supra,* 60 Cal.2d at p. 212.)

"The trial court found among other things that Pericles and Elias operated the ranch as partners, that the ranch was an asset of the partnership, and that each orally authorized the other to sell the ranch for the partnership. The court also found that . . . the agreement was fair and equitable, and that plaintiff offered to perform all its conditions, but that defendants without just cause refused to perform." (*Ellis, supra,* 60 Cal.2d at p. 213.)

As our Supreme Court stated in *Ellis,* "The Uniform Partnership Act makes it clear that, unless it is otherwise provided therein, the usual rules of law and equity, including the law of agency, apply. [Citation.] As a provision overriding the statute of frauds plaintiff relies on [Corporations Code] section 15009,[1] which reads in part: '(1) Every partner is an agent of the partnership

---

[1] Corporations Code, former section 15009 was amended and renumbered as 16301 when the Uniform Partnership Act of 1994 (Corp. Code, § 16100 et seq.) was adopted. Section 16301 provides: "Subject to the effect of a statement of partnership authority under Section 16303 both of the following apply: [¶] (1) Each partner is an agent of the partnership for the purpose of its business. An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership business or business of

for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. (2) An act of a partner which is not apparently for carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners. (3) Unless authorized by the other partners . . . , one or more but less than all the partners have no authority to: (a) Assign the partnership property in trust for creditors or on the assignee's promise to pay the debts of the partnership. (b) Dispose of the good will of the business. (c) Do any other act which would make it impossible to carry on the ordinary business of a partnership. . . .' " (*Ellis, supra,* 60 Cal.2d at p. 217.)

As the Supreme Court explained, "These provisions distinguish between acts of a partner which bind the partnership because of his status as a partner without any express authority being required and acts binding on the partnership only after express authorization by all partners. Under the express terms of subdivision (1) of the section all acts of a partner which are apparently within the usual course of the particular business bind the partnership. The effect of the provision is that the status of a partner, without more, serves as complete authority with respect to such acts, obviating the necessity of any express authority, either oral or written, from the other members of the firm. It necessarily follows that insofar as a partner limits his conduct to matters apparently within the partnership business, he can bind the other partners without obtaining their written consent. Subdivision (2), however, provides that there must be express authority for acts of a partner which do not appear to be in the usual course of the business. This subdivision does not concern the form of the required express authority, and, unlike the broad provision in subdivision (1), it contains no language which would justify a conclusion that written authority is not necessary in situations where the statute of frauds would ordinarily be applicable." (*Ellis, supra,* 60 Cal.2d at pp. 217–218.) In other words, acts of a partner falling under former section 15009, subdivision (1) are not subject to the statute of frauds, while acts falling under subdivision (2) are.

---

the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing knew or had received a notification that the partner lacked authority. [¶] (2) An act of a partner that is not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners." Further statutory references are to the Corporations Code.

The *Ellis* court concluded: "Since it does not appear that the sale of the ranch was in the usual course of the partnership business, a contract to sell it would come within subdivision (2) of section 15009, not subdivision (1), even if the ranch were a partnership asset as found by the trial court. Accordingly, the statute of frauds would be applicable and Pericles could not bind Elias without authority in writing." (*Ellis, supra*, 60 Cal.2d at p. 218.)

Here, as in *Ellis*, the sale of real property was an act outside the ordinary course of the partnership's clothing business. Consequently, under section 16301, Arthur's authority to sell the Property on behalf of his absent brothers had to be in writing. Although *Ellis* seems to resolve the precise issue before us on this appeal, Elias makes no attempt to distinguish that case or otherwise explain why *Ellis* is not dispositive. Instead, Elias relies on *Owens v. Palos Verdes Monaco* (1983) 142 Cal.App.3d 855 [191 Cal.Rptr. 381] (*Owens*), to argue that the statute of frauds does not preclude enforcement of the purchase agreement in this case.

In *Owens*, three individuals acquired 250 acres of unimproved real property in Palos Verdes. They formed four different partnerships and divided the 250 acres among them. One of these four partnerships was the defendant Monaco Land Holders, or MLH, which held a 57-acre parcel. Nearly 20 years later, a real estate developer looking to build high-end homes in Palos Verdes inquired into the availability of the land owned by MLH. Eventually, one of the three partners, Albert Fink, executed an agreement for the sale of the property; the other partners did not provide written authorization to sell. The trial court "found that Fink had apparent, or ostensible authority under Corporations Code section 15009, subdivision (1) and that '[t]he sellers are estopped to deny that Fink had authority to sell the land . . . .' " (*Owens, supra*, 142 Cal.App.3d at p. 864.)

The question presented on appeal was whether the signature of the single partner was sufficient to bind the partnership. As the Court of Appeal phrased the issue, "Fink's signature alone was sufficient to bind the partnership if the sale of the subject property was an act 'for apparently carrying on in the usual way the business of the partnership.' " (*Owens, supra*, 142 Cal.App.3d at p. 865.) In upholding the trial court's ruling, the Court of Appeal noted that "The sole purpose of the MLH partnership was the holding and sale of the subject property. The partnership agreement provided: 'The general character and nature of business of this partnership shall be the holding of the real property described in Exhibit "A" [of which the 57-acre subject property was a part] with the view to the appreciation in value thereof and the ultimate sale

of said real property in its unimproved state.' . . . There is no indication in the record that MLH had any other business other than the sale of the subject property." (*Id.* at p. 866, italics omitted.)

■ The *Owens* court held that a partner of a partnership in the business of holding unimproved real property for appreciation and resale acts with the usual course of the partnership business when he agrees to sell the partnership's real property assets; as *Ellis* instructs, because the partner's action falls under section 16301, subdivision (1), his authority to act for the partnership need not be in writing. However, the Tseng Brothers' partnership was not in the business of holding real property for appreciation and resale; it was in the business of importing and distributing clothes. Thus, section 16301, subdivision (2) applies to the facts of this case. As the *Ellis* court makes clear, the statute of frauds applies to the authority of partners to act under section 16301, subdivision (2).

■ In sum, the purchase agreement was not enforceable against the nonsignatory Tseng Brothers because it did not comport with the statute of frauds. Consequently, the judgment of specific performance must be reversed.

### 2. *Judgment in favor of Fox Realty*

Arthur testified that, after receiving the signed and binding counteroffer from Elias, Mr. Kim instructed him to prepare a counteroffer. Mr. Kim's testimony, although confusing, can be read to confirm Arthur's testimony. Based upon this state of affairs, the Tseng Brothers argue that Arthur did not know that the counteroffer which he signed was binding, and that the law provides that when " 'a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the undue influence either gives value or relies materially on the transaction.' (Restatement Second on Contracts, § 177, ¶ 3; 1 Witkin, Summary of California Law (9th ed. 1990), Contracts, § 423) . . . ." The argument lacks merit.

According to Arthur, Mr. Kim "misadvised" him to counter Elias's executed counteroffer (that is, the purchase agreement), *after* receiving the signed and binding counteroffer from Elias. By that time, Arthur had already signed and delivered to Elias the offer which Elias subsequently accepted. Thus, it is logically impossible to attribute Arthur's conduct in signing the counteroffer to Mr. Kim's subsequent "misadvice."

## DISPOSITION

The judgment in favor of Elias is reversed. Appellants to recover their costs against Elias. The judgment in favor of Fox Realty is affirmed. Fox Realty to recover its costs against appellants.

Mosk, J., and Kriegler, J., concurred.

A petition for a rehearing was denied November 21, 2007, and the petition of respondent Elias Real Estate, LLC, for review by the Supreme Court was denied February 13, 2008, S158801.