Filed 2/28/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BERNICE JACOBS,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>JOHN B. LOCATELLI, as TRUSTEE, etc., et al.,<br><br>    Defendants and Respondents. | H042292<br>(Santa Clara County<br>Super. Ct. No. CV179082)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 8, 2017, be modified as follows:

1. On the backing sheet, line 6, the name "David" is changed to "Daniel" so the line reads:

   Daniel W. Ballesteros

2. On the backing sheet, line 7, the initial "F." is changed to "J." so the line reads:

   Martin J. Kopp.


There is no change in the judgment.

_____
                                RUSHING, P.J.


WE CONCUR:


_____
PREMO, J.


_____
ELIA, J.

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| BERNICE JACOBS, | H042292 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV179082) |
| v. | |
| JOHN B. LOCATELLI, as TRUSTEE, etc., et al., | |
| Defendants and Respondents. | |


**INTRODUCTION**

Bernice Jacobs (Jacobs) appeals from a judgment entered by the trial court after a demurrer to her complaint was sustained without leave to amend. Jacobs is a real estate broker who claims that she is owed a commission for her efforts to sell a parcel of property in Marin County. She alleges that, although certain owners did not sign the agreement that promised the commission, the owner who did sign the contract told her that he was signing as the agent of the others, who had formed a joint venture. The non-signing owners, whose demurrer was sustained, mainly argue that her claims are barred by the statute of frauds and the parol evidence rule. Because we find that neither bars Jacobs's claims, we will reverse the judgment as to all of the causes of action challenged by Jacobs.

FACTUAL AND PROCEDURAL BACKGROUND

Bernice Jacobs is a licensed California real estate broker.[1] On April 9, 2013, she signed a "Vacant Land Listing Agreement" (the agreement), under which she was granted the "exclusive and irrevocable right" to sell a parcel of real property in Marin County (the property) from the date of the signing of the contract until one year later, on April 9, 2014.[2]

The listing price for the property was $2,200,000 and if Jacobs procured a buyer for the property during the listing period (or if there was a contract for sale entered into by the sellers within 60 days after the expiration of that period), Jacobs would receive a commission of $200,000. However, the agreement specified that if an entity called the "Open Space Land Trust" bought the property, Jacobs would receive no commission.

Besides Jacobs, only one person signed the agreement, John B. Locatelli (Locatelli). He signed as trustee of the John B. Locatelli Trust. There are signature lines, however, for additional parties, including 1) "Gregory J. Gates, Trustee of the Gregory J. Gates Invivos Trust"; 2) Gisele Hainry; 3) Joe Medes; 4) Sylvie Mendes, and; 5) the "Santa Cruz Clean and Sober Homes a California Non-profit Corporation."[3]

These signature lines, however, are left blank—neither these five defendants (nor any of the other owners of the property) signed the agreement. Jacobs claims, however, that Locatelli told her when he was signing the agreement that he was authorized to act on behalf of the other owners. She claims that a written "agency agreement" exists

---

[1] The basic factual summary is taken from Jacobs's first amended complaint.

[2] Technically, in the agreement, the broker is denominated as "Bernice Jacobs Realty" with Jacobs listed as an agent.

[3] For the sake of clarity, we will refer to these five as the "owners," even though there were other sellers, besides Locatelli, listed in both the agreement and in Jacobs's eventual complaints (See fn. 5, *infra.*)

between Locatelli and the owners, which she contends she will obtain through discovery. (We also note that the term, "Owner," is defined in the agreement not just as Locatelli, but as "John B. Locatelli, Trustee of the John B. Locatelli Trust, et al.")

Although the owners did not sign the agreement, Jacobs claims that they were were aware of her retention as a broker and that two individual owners, including Joe Mendes, acknowledged her employment, were impressed by her performance, and inquired about working with her on other projects.

After the agreement was finalized, Jacobs began working to market the property. She spent significant effort in this work, identifying and contacting potential buyers, working sometimes "12-14 hours per day . . . ." On or about April 15, 2013, Jacobs contacted an entity called The Trust For Public Land (TPL). She identified herself as the exclusive broker for the property and exchanged e-mails with Joe Henry, TPL's director of acquisitions.

"Within a couple days," as Jacobs puts it, she called Locatelli to tell him the "good news" that TPL was interested in buying the property. Locatelli, rather than being pleased, was angry and asked for the contact information for Joe Henry at TPL. Locatelli, according to Jacobs, asserted that he had been speaking with TPL for three years and that he wanted to change the exemption in the agreement from the Open Space Land Trust to TPL.

Jacobs claims that she investigated what Locatelli had said about his prior contact with TPL—and that Joe Henry told her that he did not know Locatelli and had never spoken with him prior to Jacobs's contacting him. Henry also told Jacobs that he was not aware the property was for sale until he had been contacted by Jacobs. Locatelli then called Jacobs and told her that he had instructed TPL not to speak with her about the property and that TPL was to deal directly with him about the sale. Sometime in 2013, the owners and TPL entered into an agreement for TPL to buy the property. The sale,

3

however, was never consummated, apparently because issues arose between the owners and TPL.[4]

On April 4, 2014, Jacobs filed a complaint against the owners of the property (as well as TPL). She purported to plead causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, anticipatory breach (implied repudiation), and specific performance. The owners filed a demurrer to the original complaint. They argued that, as they had not signed the agreement, Jacobs's complaint was barred by the statute of frauds and that any argument that Locatelli signed on their behalf was foreclosed by the agreement itself and the fact that the property was held as tenants in common, not by a partnership.

Jacobs opposed, arguing, among other things, that Locatelli signed the agreement on behalf of the joint venture, which consisted of all of the owners of the property. After the owners replied, the court sustained the demurrer with leave to amend. The trial court did not offer any reasoning in its written order, noting only that it had considered the papers submitted.

On December 18, 2014, Jacobs filed her first amended complaint. Jacobs again attempted to plead causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, anticipatory breach (implied repudiation), and specific performance. Jacobs repeated and expanded on her prior allegations, claiming that the owners were part of a joint venture, the purpose of which was to invest in the property, which they acquired after foreclosing on the prior owner of the property, to whom the owners had lent funds.

---

[4] The parties did not below, nor do they here, offer any argument on the question of whether Jacobs would still be entitled to the commission because of the ultimate failure of the sale. We therefore will not address this issue.

4

The owners again demurred to the complaint. They argued that Jacobs's joint venture allegations did not save her complaint against the statute of frauds because the agreement did not have a reference to Locatelli's authority to sign on their behalf or to the joint venture itself, that multiple beneficiaries under a deed of trust (which they argued they were) did not constitute a joint venture in any event, that lenders are not joint venturers, and that Jacobs's specific performance claim was barred because the agreement was a personal services contract. Jacobs filed her opposition and the owners replied.

In an order dated March 5, 2015, the trial court sustained the owners' demurrer without leave to amend, again without explaining its reasoning in writing. The only defendant left in the case was Locatelli.[5] A judgment of dismissal was filed on April 8, 2015 and this timely appeal followed.

## DISCUSSION

Jacobs argues that the trial court should not have sustained the owners' demurrer because her joint venture allegations were sufficient to withstand demurrer. The owners argue, however, that Jacobs's complaint was barred by the statute of frauds and by the parol evidence rule (with a passing reference to what they perceive as the weakness of Jacobs's factual allegations).[6] As we shall explain, we agree with Jacobs that the trial court's order was erroneous.

---

[5] It should be noted that Locatelli, along with six other non-signing owners, also demurred to both complaints, in which Locatelli argued that even he was not bound by the agreement because his undivided interest in the property could not be sold without the signature of the others. The trial court overruled Locatelli's demurrer, but it dismissed the six non-signing owners, who had made essentially the same arguments on demurrer as the other five non-signing owners. Although Jacobs's notice of appeal could possibly cover the judgment as to these other six non-signing owners, she only appears to directly challenge the trial court's ruling as to the five non-signing owners listed above.

[6] Although the owners argue that trial court was correct to sustain the demurrer to the specific performance cause of action, Jacobs does not mention the issue in either of

*I.*      *Standard Of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [citation]; *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 828 [citation].) The court does not, however, assume the truth of contentions, deductions or conclusions of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [citations].) The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 21 [citations].) However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 103 [citations].)" *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.

*II.*      *The Statute of Frauds Was Not a Proper Basis For The Owners' Demurrer*

The main dispute between the parties is whether the trial court properly sustained the demurrer to Jacobs's contract-based claims because of the statute of frauds. Before we discuss the relevant law, it is necessary to explain precisely what the agreement shows.

A plain visual inspection of the document shows that Locatelli's signature was the only one, besides that of Jacobs. Right above his signature line is the notation "Owner: John B. Locatelli, Trustee of the John B. Locatelli Trust," with his title listed as "Trustee." As mentioned above, while there were signature lines for the remaining

---

her appellate briefs. In fact, Jacobs leaves unaddressed the owners' argument that any challenge to the trial court's ruling on the specific performance cause of action has been waived. We will therefore treat the issue as waived and the trial court's order in this respect will be left undisturbed.

6

owners, they were left blank. However, at the very top of the agreement, "Owner" is defined (with emphasis added) as "John B. Locatelli, Trustee of the John B. Locatelli Trust, *et al*." "Et al." clearly means, in this context, "and others." (Webster's 3d New Internat. Dict. (1993) p. 779.)

The owners argue that the issue presented here is straightforward—they did not sign the agreement to pay Jacobs a commission and they therefore cannot be bound by it. This argument has some surface appeal. As our Supreme Court stated nearly 30 years ago, "[a] broker's real estate commissions agreement is invalid [citation] unless the agreement 'or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by the party's agent.' " (*Phillippe v. Shappell Indus.* (1987) 43 Cal.3d 1247, 1258 (*Phillippe*) [citing former Civ. Code 1624, subd. (d).).[7] Our Supreme Court has emphatically stated that it is "not unfair to require licensed brokers to comply with the statute of frauds," especially in light of the licensing and educational requirements applicable to brokers as a matter of law. (*Id.* at p. 1267.)

The "courts have long had little sympathy for the broker who fails to adhere to the statute of frauds." (*Phillippe, supra,* 43 Cal.3d at p. 1261.) Even where unfairness results, the statute of frauds has been enforced. (*Ibid*.) The statute of frauds is so strong in this context that the only manner in which a defendant may be estopped from asserting the defense is if there is a "showing of actual fraud by the party to be charged . . . ." (*Id.* at p. 1264.)

---

[7] The relevant statute is now at Civil Code section 1624, subdivision (a)(4), and provides that "an agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate, or to lease real estate for a longer period than one year, or to procure, introduce or find a purchaser or seller of real estate where the lease is for a longer period than one year, for compensation or for commission" is invalid unless it is in "writing and subscribed by the party to be charged or by the party's agent."

All further statutory references are to the Civil Code unless otherwise noted.

Jacobs alleges in her complaint that "Locatelli told [her], at the time he executed the [a]greement, that he was authorized to act on behalf of all" the owners. Seizing on this allegation that Jacobs did not have *written* proof of Locatelli's supposed agency at the time the listing agreement was signed, the owners assert the relevancy of the equal dignities rule, a close relative of the statute of frauds. This rule "is embodied in section 2309 of the Civil Code and reads as follows: 'An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing.' " (*McGirr v. Gulf Oil Corp.* (1974) 41 Cal.App.3d 246, 254.)

Despite the attention they are paid by the owners, however, neither the statute of frauds itself (as expressed in *Phillippe)* nor the equal dignities rule is directly applicable here. The owners entirely ignore the fact that Jacobs *does* specifically allege that a "written agency agreement exists between [Locatelli]" and the owners. Instead of dealing with this allegation in their appellate brief, the owners, within the space of a few sentences, skip from discussing the requirement of a written authorization between the owners and Locatelli to the entirely distinct issue of whether Jacobs had to be in possession of Locatelli's authorization itself (an argument left undeveloped and for which the owners provide us no analysis). In any event, if true, Jacobs's allegation satisfied the equal dignities rule with respect to Locatelli's authorization from the other owners.[8]

The real issue is whether Jacobs's allegation that Locatelli signed on behalf of the other owners, who formed a joint venture, is sufficient to satisfy the statute of frauds.

---

[8] We note as an aside Locatelli may not necessarily have had to have a written authorization from the other owners if it could be proven that the authority existed within the ordinary course of the joint venture alleged by Jacobs to exist. "Any partner can execute any contract or other instrument in the ordinary course of the partnership business, and the partnership is bound by the contract even though the contract is within the statute of frauds and the partner's authority is not in writing." (1 Miller & Starr, Cal. Real Estate (4th Ed. 2015), Contract Law, § 1:94, p. 1-360, fn. omitted.)

Although Locatelli tried to argue that even *he* was not liable to pay the commission, an argument the trial court rejected, the crux of this dispute is the effect of Jacobs's allegation that Locatelli signed on behalf of the other owners. This takes us into another realm, which is the applicability of the statute of frauds to the identity of parties to an agreement, an issue neither party briefed entirely adequately on appeal.

We note here that our Supreme Court has adopted a pragmatic approach to this question—and it did so in a decision published approximately two decades after the decision in *Phillippe*. (See *Sterling v. Taylor* (2007) 40 Cal.4th 757 (*Sterling*).) As was stated in that case: " 'The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made. . . . Therefore, if after a consideration of the surrounding circumstances, the pertinent facts and all the evidence in a particular case, the court concludes that enforcement of the agreement will not subject the defendant to fraudulent claims, the purpose of the Statute will best be served by holding the note or memorandum sufficient even though it is ambiguous or incomplete.'(10 Williston on Contracts (4th ed. 1999) § 29:4, pp. 437-438, fns. omitted.)" (*Id.* pp. 770-771, fn. omitted.)

As a result of *Sterling*, it is indisputably the law that "when ambiguous terms in a memorandum are disputed, extrinsic evidence is admissible to resolve the uncertainty." (*Sterling, supra,* 40 Cal.4th at p. 767.) The agreement must still provide the essential terms, and it is "clear that extrinsic evidence cannot *supply* those required terms." (*Ibid.*) "It can, however, be used to *explain* essential terms that were understood by the parties but would otherwise be unintelligible to others." (*Ibid.*)

We are of the view that the trial court should have allowed the case to proceed so that Jacobs could introduce extrinsic evidence of the manner in which Locatelli signed

9

the agreement and that its failure to do so runs afoul of the Supreme Court's pragmatic approach to the statute of frauds as set forth in *Sterling*. While it is true that Locatelli did not explicitly indicate in the agreement that he was signing as an agent for any other entity or individual, it is also true that the agreement specified that there were multiple owners, which could be interpreted as referring to all of the members of the joint venture which Jacobs claims exists. In *Sterling* itself, for example, the Supreme Court allowed extrinsic evidence to show that a person who signed the agreement was in fact an agent of the entity which owned the property, even though the entity's name was entirely missing from the agreement and the contract did not state that the signatory was signing as an agent for that missing entity. (*Sterling, supra,* 40 Cal.4th at p. 773.)

This conclusion is further buttressed by Jacobs's allegations that two of the non-signing owners treated her as their broker after the agreement was signed. "It is a 'cardinal rule of construction that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties.' (*Bohman v. Berg* (1960) 54 Cal.2d 787, 795 . . . .) The same rule governs the interpretation of a memorandum under the statute of frauds. [Citations.]" (*Sterling, supra,* 40 Cal.4th at pp. 772-773.) Here, the trial court's ruling ended Jacobs's case—even in the face of the potentiality that the non-signing owners acknowledged that Jacobs was their broker. Especially if there is a written agreement between Locatelli and the other owners allowing him to act as their agent with respect to Jacobs, it is very difficult to see how the owners will be subject to a fraudulent claim by Jacobs.

The correctness of this result is also exemplified by a case which the owners argue is "similar to the case at bar," *Elias Real Estate, LLC v. Tseng* (2007) 156 Cal.App.4th 425 (*Elias*.) In that case, the trial court granted specific performance to a buyer of real estate. (*Id.* at p. 429.) The appellate court reversed because the sale contract had only

10

been signed by one brother to a partnership and there was "absolutely no evidence admitted at trial that the [brother/partners] had executed a written authorization with respect to the sale of the [p]roperty"—so the buyer's action was barred by the statute of frauds. (*Id*. at p. 430.) As this quotation shows, *Elias* involved an appeal from a *trial* in which all of the evidence was available to the appellate court for consideration. (*Ibid*.) If anything, *Elias* stands for the proposition that the trial court's sustaining of the owners' demurrer was erroneous because it prohibited the hearing of any evidence at all. We do not believe that the statute of frauds justified the trial court's order.

### III.     *The Terms Of The Agreement Do Not Bar Jacobs's Claims*

As the above discussion makes clear, there is a close relationship between the parol evidence rule and the statute of frauds, although they are in fact separate. Having discarded the owners' arguments about the statute of frauds, we now turn to their apparent argument that, because the agreement was fully integrated, Jacobs's claims were barred by the parol evidence rule itself.

The owners argue that paragraph 20 of the agreement constitutes a complete integration of the contract and that any evidence of what Locatelli might have told Jacobs prior to or at the signing of the agreement cannot now be used to argue that they, in addition to Locatelli, are beholden to pay her under the agreement. That paragraph, in relevant part, reads as follows: "**20.  ENTIRE CONTRACT:**  All prior discussions, negotiations, and agreements between the parties concerning the subject matter of this Listing Agreement are superseded by this Listing Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any oral agreement or contemporaneous oral agreement."

A basic statement of the parol evidence rule is set forth in the Code of Civil Procedure: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by

11

evidence of a prior agreement or of a contemporaneous oral agreement." (Code Civ. Proc., § 1856, subd. (a).) "Thus, if there has been a legally effective act . . . the exclusionary aspect of the parol evidence rule comes into operation where the parties have adopted a writing or writings as a final and complete expression of their understanding." (2 Witkin, Cal. Evidence (5th Ed. 2012), Documentary Evidence, § 66, p. 207.) If a contract sets forth the entire agreement of the parties, it is said to be "integrated." (See *Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 742.)

We do not believe that the parol evidence rule provided a sufficient basis for the owners' demurrer because we do not believe that any term of the agreement is contradicted by Jacobs's allegations. " '[T]he rule is well settled that where a reading of a simple contract, however inartificially it may be drawn, discloses that it is executed for or on behalf of a principal, or discloses an intent to bind such principal, *or even leaves the matter one of doubt*, parol evidence may be employed to determine whose contract it is, and this even in cases where the instrument is sufficiently clear in its terms to bind the agent. This is not contradicting by parol the terms of a written instrument, for, as has been said, "It is no contradiction of a contract, which is silent as to the fact, to prove that a party is acting therein not on his own behalf, but for another. 'This does not deny,' [citation] 'that it is binding on those whom, on the face of it, it purports to bind; but shows that it also binds another, by reason that the act of the agent, in signing the agreement in pursuance of his authority, is in law the act of the principal.' " [Citation.]' " (*Greenwood v. Mooradian* (1955) 137 Cal.App.2d 532, 543-544, quoting *Southern Pac. Co. v. Von Schmidt Dredge Co.* (1897) 118 Cal. 368, 371, italics added.)[9]

_____

[9] See also *Zelkin v. Caruso Discount Corp.* (1960) 186 Cal.App.2d 802, 806-807 ["Defendants next contend that the judgment is erroneous in that, of the eight defendants, only Caruso Discount Corporation executed the written contract upon which this suit was brought. However, it clearly appears from the evidence that from the outset plaintiff was employed to represent all of the defendants and it further appears that it was the intention of the parties that the retainer agreement should encompass his services in relation to all

The owners do not successfully point to a single provision of the agreement which is contradicted by Jacobs's allegations. Their only attempt is to point to paragraph 5 of the agreement, which, though we mentioned it above, we now quote: "**5. OWNERSHIP, TITLE, AND AUTHORITY**. Owner warrants that: (i) Owner is the owner of the Property; (ii) no other persons or entities have title to the Property, and (iii) Owner has the authority to both execute this Listing Agreement and transfer the Property."

The owners argue that paragraph 5 makes it clear that only the owner, "as defined," has the authority to execute the agreement and that there were no exceptions which would have allowed Locatelli to sign on behalf of any other owners. But they curiously do not go on to say how the term is in fact, *defined.* As we have mentioned, the term "Owner" is defined as "John B. Locatelli, Trustee of the John B. Locatelli Trust, et al." Given the ambiguity of what was meant by "et al." we do not believe that Jacob's allegation that Locatelli signed on behalf of the other owners or on behalf of the joint venture between all of the owners of the property would necessarily contradict the terms of the agreement. We therefore do not believe that the parol evidence rule, even apart from the statute of frauds, stands as a bar to Jacobs's claims against the owners.[10]

eight defendants. The identities of the real parties in interest under the contract were clearly revealed by parol evidence [citations] and, furthermore, each of the defendants had executed a power of attorney appointing the plaintiff as their agent to negotiate with the Treasury Department. That it was intended that these several contracts should cover plaintiff's employment was clearly developed at the trial. [Citation.] Thus, all of the defendants were, in effect, parties to the written agreement and the judgment against them was proper in this respect."]

[10] We also reject the owners' argument that Jacobs has failed to allege the existence of a joint venture. We note that the owners' argument on this point seems to specifically urge that the trial court was correct in weighing "circumstantial evidence." That, of course, is not the trial court's role when presented with a demurrer. In any event, there are only three elements to show the existence of a joint venture, which are similar to a general partnership: (1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control. (See *580 Folsom Assocs. v.*

13

The judgment of dismissal is reversed.  The matter is remanded to the trial court for further proceedings consistent with the views expressed herein.  Costs on appeal are awarded to Jacobs.


_____
RUSHING, P.J.



WE CONCUR:




_____
PREMO, J.




_____
ELIA, J.

_____

*Prometheus Dev. Co*. (1990) 223 Cal.App.3d 1, 15-16.)  We have reviewed Jacobs's complaint and find that she has alleged the existence of such a joint venture.  (See also 1 Miller & Starr, Cal. Real Estate (4th Ed. 2015), Contract Law, § 1:95, p. 1-367 [joint ventures treated substantially similarly to general partnerships].)


14

Trial Court:                                    Santa Cruz County Superior Court
Superior Court No.: CV179082


Trial Judge:                                    The Honorable Paul M. Marigonda




Attorneys for Plaintiff and Appellant          Hoge, Fenton, Jones & Appel, Inc.
Bernice Jacobs:
                                                David W. Ballesteros
                                                Martin F. Kopp




Attorneys for Defendants and Respondents        Law Offices of Glen H. Olives
John B. Locatelli, as Trustee, etc., et al.:
                                                Glen H. Olives

15