Filed 4/21/21  5401 Associates, L.P. v. State of Cal. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| 5401 ASSOCIATES, L.P., | B292649 |
| Plaintiff, Cross-defendant and Appellant, | Los Angeles County Super. Ct. No. BS159841 |
| v. | |
| STATE OF CALIFORNIA, et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge. Affirmed in part, reversed in part, and remanded.

Law Offices of Henry N. Jannol, Henry N. Jannol and Paul H. Levine for Plaintiff, Cross-defendant and Appellant.

Xavier Becerra, Attorney General, Tamar Pachter, Assistant Attorney General, Brian D. Wesley and Hutchison B. Meltzer, Deputy Attorneys General, for Defendants, Cross-complainants and Appellants.

# INTRODUCTION

The State of California[1] (State) entered into a 20-year lease agreement (lease) regarding real property (property) owned by 5401 Associates, L.P. (Landlord) that contained a provision allowing the State to convert the lease to a lease with purchase option (lease-option) agreement and purchase the property for $1 at the end of the lease term. The State occupied the property for the full lease term and attempted to make the conversion and exercise the purchase option. But Landlord refused to sell the property, claiming the State did not fully comply with certain lease provisions relating to the conversion of the lease. Those provisions require compliance with Government Code section 14669[2] which, in turn, requires the State to obtain specific authorization from the Legislature and engage in a competitive bidding process before entering into a lease-option agreement.

Landlord filed a complaint alleging the State breached the lease and sought declaratory relief to the effect that the sale of the property under the terms of the lease was not required. The State filed a cross-complaint seeking specific performance of the lease and monetary damages resulting from the delay in the sale. The court ordered specific performance of the lease but denied the State's request for the return of approximately $1.3 million of rental payments made during its 18-month holdover tenancy.

---

[1] We generally refer to the defendants and cross-complainants (the State, the Department of General Services, and the Director of the Department of Government Services) collectively as "the State" and will refer to the Director of the Department of General Services as "the Director" as appropriate.

[2] All undesignated statutory references are to the Government Code.

The court also awarded Landlord $363,784.94 for unpaid rent. Both sides appeal.

We conclude that the court did not abuse its discretion in granting the State's request for specific performance of the lease. The court erred, however, in denying the State's request for damages relating to the delay of the sale of the property and in awarding Landlord damages for unpaid rent. We therefore affirm the judgment in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND[3]

### 1.    The Lease

In 1995, the Director signed an agreement on behalf of the State to lease the property—an office building and adjacent parking area—from Landlord. The property is located at 5401 Crenshaw Boulevard in Los Angeles. The lease's 20-year term ran from February 1, 1996 to January 31, 2016. The State operated an office of the Employment Development Department at the property and occupied the property for the full term of the lease.

The lease allowed the State to purchase the property under certain conditions. As pertinent here, Paragraph 35 of the lease states:

"[Landlord] acknowledges that the parties contemplate converting this lease to a lease purchase agreement at such time as State has obtained legislative authority to do so. Accordingly, [Landlord] agrees that upon signature by the Governor of the State of California of legislation authorizing the Director of

---

[3] The parties stipulated to the facts essential to our decision.

3

General Services to convert this lease to a lease purchase in accordance with Government Code Section 14669, [Landlord] shall be obligated to sell the premises upon the election by the State to exercise the option to purchase the premises in accordance with the terms of the Option to Purchase set forth below, attached to this lease and incorporated herein by this reference. The parties acknowledge and agree that until the passage of authorizing legislation which is a condition precedent to converting this lease to a lease purchase, this lease shall be and is an operating long term lease and [Landlord] shall have no obligation to sell, nor shall State have any obligation to convert this lease to a lease purchase[,] nor have any other obligation to purchase or acquire fee title to the property.

"Upon receipt of legislative authority to do so, State may at its sole discretion elect to convert this lease to a lease with a purchase option, by giving the [Landlord] written notification. In the event the State sends this notice the following terms shall apply: The state shall have the option to purchase the lease premises, including all improvements upon said premises. It is agreed that the State's option to purchase the leased premises may be assigned to another State agency or any other nominee designated by the State. The option to purchase property may be exercised to provide for a date of purchase on or after January 31, 2016 upon the following terms and conditions:

"A. [Landlord] must notify State in writing of the option right on, or after, August 1, 2015. Failure to do so will prohibit the [Landlord] from raising the rent, during holdover, until 120 days after the option right notice is sent to State.

"B. State will give [Landlord] written notice of the exercise of its option not less that ninety (90) days after receipt of notice.

4

"C. The purchase price on or after January 31, 2016 is: $1.00[.]

"D. The conveyance shall be by grant deed in fee simple, free and clear of all liens, encumbrances, easements, or any other title exception save and except public utility easements and matters which may be acceptable to State.

"E. The purchase shall be handled through escrow opened by the [Landlord] with a title company approved by the State. The State will be furnished with a standard CLTA policy of title insurance in the amount of the market value showing title vested in the State as aforesaid. All expenses of such escrow, including the title insurance premium, shall be paid by the State.

"F. In the event this lease is terminated by the State exercising its purchase option, the provision in Paragraph 10 shall not apply. The right of option to purchase the property is contingent upon the State taking the property 'as is'.

"G. The State is hereby authorized to record a Request for Notice of Default; and in order to cure any mortgage payment default, deduct any amounts so paid from the rental payments due.

"H. [Landlord] agrees to provide a fully executed and properly acknowledged Grant Deed into escrow thirty (30) days prior to the effective date of purchase as set forth in State's written notice to exercise purchase. [Landlord]'s submittal of the signed and acknowledged Grant Deed into escrow shall not be contingent upon submittal of buyers escrow instructions."

## 2. Lease Conversion to Lease-Option Agreement

In late 2013 and early 2014, the parties attempted unsuccessfully to negotiate a new long-term lease of the property. Eventually, the State decided to purchase the property.

5

In June 2015, the Legislature passed and the Governor signed the Budget Act of 2015 which appropriated $1,000 for the purchase of the property. (Stats. 2015, ch. 10, § 2 (A.B. No. 93).)

The appropriation was included in the section of the budget called "Labor and Workforce Development Agency" and stated as follows:

"7100-301-0001–For capital outlay, Employment Development Department ………………………………. 1,000

Schedule:

(1)    0000714-Crenshaw Blvd. Building, Los Angeles: Exercise Lease Purchase Option–Acquisition……………… 1,000"

After enactment of the Budget Act of 2015, the State processed a request with the State Public Works Board for authorization to purchase the property. The Public Works Board approved the purchase on December 11, 2015.

The State and Landlord communicated about the potential purchase in late 2015. On September 24, 2015, the State notified Landlord that it was exercising its conversion right under the lease and planned to purchase the property. Further, the State advised Landlord that the lease conversion and the acquisition of the property had been authorized by the Legislature through the Budget Act of 2015.

Landlord, now represented by counsel, rejected the State's request on September 30, 2015. Landlord asserted the State could not convert the lease to a lease-option agreement and exercise an option to purchase the property because the appropriation in the 2015 Budget Act did not constitute "specific legislative authorization," which was required under Government Code section 14669 and Paragraph 35. The State responded on

6

October 15, 2015 and advised Landlord that it intended to proceed with the purchase. Further, the State requested that Landlord immediately open escrow to effectuate the purchase and sale, noting "[g]iven that the Lease term ends on January 31, 2016, time is of the essence." Landlord refused, again claiming that the State had not satisfied the lease condition requiring specific authorization from the Legislature. Finally, on November 30, 2015, the State again notified Landlord that it was exercising the option to purchase the property and that it had opened escrow for the purchase.

The parties were still at an impasse when the lease term ended on January 31, 2016. The State continued to occupy the premises until October 2017 and paid Landlord more than $1.3 million in rent during the holdover tenancy.

### 3. The Litigation

Landlord initiated the present action on January 25, 2016, shortly before the lease term expired. The operative second amended verified complaint asserted a claim for breach of contract (the lease agreement) and seeks declaratory relief. The complaint alleged that the State failed to obtain the legislative approval for the acquisition of the property required under section 14669 and under the lease and therefore breached the contract. In addition to seeking damages on its contract claim, Landlord sought declaratory relief to the effect that the State breached the lease and, more particularly, that it failed to convert the lease to a lease-option agreement and therefore had no right to purchase the property.

The State cross-complained, seeking specific performance of the lease agreement, i.e., the provision regarding sale of the property to the State. The State also stated a claim for breach of

7

contract and sought declaratory relief concerning its right to purchase the property.

The court conducted a bench trial in two phases. The first phase concerned performance under the lease agreement. The parties stipulated to the vast majority of the relevant facts in lieu of presenting testimony. Both sides, however, presented expert testimony regarding market rental rates. The court ultimately found that testimony of minimal relevance to the issues. The second phase of the trial related to monetary damages. The appellate record is incomplete on that issue, however.

4.     **The Judgment; the Appeal and Cross-appeal**

The court found that the State failed to follow strictly the requirements of section 14669. The court, however, rejected Landlord's argument that the State could not be entitled to specific performance of the lease under Civil Code section 3392.[4] Specifically, the court found that the State's failure to perform was partial and that the areas of nonperformance were meant to protect the State, not Landlord. In other words, the State's partial noncompliance with section 14669 was immaterial with respect to Landlord's interests.

As to damages, the court rejected the State's claim that it was entitled to the return of rent paid to Landlord during the

---

[4] "Specific performance cannot be enforced in favor of a party who has not fully and fairly performed all the conditions precedent on his part to the obligation of the other party, except where his failure to perform is only partial, and either entirely immaterial, or capable of being fully compensated, in which case specific performance may be compelled, upon full compensation being made for the default." (Civ. Code, § 3392.)

8

holdover tenancy. Further, the court awarded Landlord $363,784.94 representing unpaid rent for the period July 2, 2017 to October 18, 2017. The court denied Landlord's request for operating expenses during the holdover tenancy, however.

The court entered judgment on July 3, 2018. Landlord appeals from the judgment on specific performance and the State cross-appeals from the denial of its request for the return of rent paid during the holdover tenancy and the award of monetary damages to Landlord.

## DISCUSSION

### 1. The court did not abuse its discretion by ordering specific performance of the lease agreement.

#### 1.1. Standard of Review

Specific performance is an equitable remedy. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 846.) We review a judgment granting specific performance under the abuse of discretion standard and determine whether the trial court's grant of specific performance exceeded the bounds of reason. (*Petersen v. Hartell* (1985) 40 Cal.3d 102, 110; *Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472 (*Real Estate Analytics*).) On issues of contractual interpretation where there is no conflicting extrinsic evidence, we are not bound by the court's interpretation and will decide the issue de novo. (*Benach*, at p. 847.)

#### 1.2. Specific Performance

"To obtain specific performance after a breach of contract, a plaintiff [or, in this case, a cross-complainant] must generally show: '(1) the inadequacy of his legal remedy; (2) an underlying

9

contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract.' " (*Real Estate Analytics, supra*, 160 Cal.App.4th at p. 472.) Where, as here, the contract concerns the purchase of real property, monetary damages are presumed to be inadequate. (Civ. Code, § 3387; 12 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 40:18 ["It is presumed that when a seller of real property fails to convey title, the remedy of damages to the buyer is inadequate and the buyer is entitled to specific performance as a matter of course, unless there is an equitable reason for denial."].)

Specific performance is not always available, however. Under Civil Code section 3392, for example, "[s]pecific performance cannot be enforced in favor of a party who has not fully and fairly performed all the conditions precedent on his part to the obligation of the other party, except where his failure to perform is only partial, and either entirely immaterial, or capable of being fully compensated, in which case specific performance may be compelled, upon full compensation being made for the default." Citing this provision, Landlord contends the court erred by ordering specific performance because the State failed to fully perform under the lease. Specifically, as noted *ante*, Paragraph

10

35 required the State to comply with section 14669, which currently[5] reads:

"(a) The director may hire, lease, lease-purchase, or lease with the option to purchase any real or personal property for the use of any state agency, including the Department of General Services, if he or she deems the hiring or leasing is in the best interests of the state.

"(b) The director shall not enter into a lease-purchase agreement that involves office space, unless specifically authorized to do so by the Legislature. The director shall solicit written bids for any lease-purchase that involves office space in a newspaper of general circulation in the county in which the project is located. All bids received shall be publicly opened and the lease awarded to the lowest responsible bidder. If the director deems the acceptance of the lowest responsible bid is not in the best interest of the state, he or she may reject all bids."

Landlord argues the State did not comply with section 14669, subdivision (b), in two respects. First, Landlord claims the State failed to obtain specific authorization from the Legislature to convert the lease to a lease-option agreement and consummate the purchase. Second, Landlord asserts the State failed to solicit written bids in connection with the transaction. We address these issues in turn.

---

[5] This section was amended twice during the lease term. (See Stats. 1998, ch. 597, § 3; Stats. 2009, ch. 284, § 3.) Those amendments are not material to our analysis except as noted.

### 1.3. The Legislature specifically authorized the purchase of the property.

Although the 2015 Budget Bill allocated $1,000 for the purchase of the property, Landlord contends the State failed to obtain the Legislature's "specific authorization" to convert the lease to a lease with purchase option agreement or to purchase the property. Section 14669 does not define "specific authorization." On its face, however, it appears to require legislative approval that relates to a particular transaction.

The Budget Act of 2015 authorizes the acquisition of property on Crenshaw Boulevard for use by the Employment Development Department, the former tenant at the property, stating:

"7100-301-0001–For capital outlay, Employment Development Department ……………………………… 1,000

Schedule:

(1)     0000714-Crenshaw Blvd. Building, Los Angeles: Exercise Lease Purchase Option–Acquisition………………1,000"

Nevertheless, Landlord dismisses this authorization as inadequate. Without providing any analysis of the relevant statutory language, Landlord claims it is "clear from the legislative history"—which it does not cite—that the specific authorization called for under section 14669 is "individual legislation" tailored to the contemplated transaction. In other words, Landlord interprets the statute to mean that a specific line-item appropriation in the Legislature's annual budget bill, without more, cannot satisfy section 14669.

Assuming without deciding that the statute is ambiguous,[6] we conclude that legislative history does not support Landlord's position. As part of the Legislature's 1981 Budget Act, the Legislature clarified that the Director could not only lease property on behalf of the State but could also enter into lease-purchase agreements and lease-option agreements. (Stats. 1981, ch. 99, § 28.20, p. 602.) The Legislature initially required that any lease-purchase or lease-option agreement be approved by the Legislature through the normal budgeting process. (*Ibid.* ["The Director of General Services shall not enter into a lease-purchase agreement or a lease with the option to purchase agreement with another entity, public or private, which involves building space, unless the agreement has been approved through the normal budget process."].) The Legislature subsequently amended the 1981 Budget Act, however, to provide greater flexibility with respect to that approval process. The amendment eliminated the requirement that a lease-purchase and lease-option agreement had to be approved during the annual budget process and instead required only notice to the Joint Legislative Budget Committee and analysis by the Legislative Analyst. (Stats. 1981, ch. 919, § 2, p. 3466 ["The Director of General Services shall not enter into a lease purchase agreement or a lease with the option to purchase agreement with another entity, public or private, which involves building space, unless the agreement has been reviewed by the Legislative Analyst and notification has been given to the Joint

---

[6] In construing a statute, we use extrinsic sources such as legislative history only when the statutory terms are ambiguous. (E.g., *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

13

Legislative Budget Committee."].) Section 14669 was amended accordingly. (Stats. 1981, ch. 919, § 1, pp. 3465–3466.)

Of course, nothing in these enactments suggests that legislative authorization of a lease-purchase or lease-option agreement would be ineffective if it were included in an annual budget bill. Rather, the Legislature adopted the more flexible procedure to enable the State, through the Director, to use public money in a prudent manner by taking advantage of fast-changing market conditions—an approach the Legislature concluded was beneficial but inherently incompatible with the annual budget approval process. In other words, by amending section 14669 in 1981, the Legislature expanded, rather than restricted, the ways in which it could approve lease-purchase and lease-option agreements.

The Legislature modified section 14669 again in 1983, adding the "specifically authorized" language that appears in the statute today. The 1983 amendment slightly modified the statute's notice and analysis requirements and continued them with respect to lease-purchase or lease-option agreements with an initial option of $2 million or less. As to agreements with a purchase or option price of more than $2 million, however, the Legislature restricted the Director's authority somewhat by prohibiting the Director from entering into such agreements "unless specifically authorized to do so by the Legislature." (Stats. 1983, ch. 323, § 45.5, p. 972.) Although little mention is made of this specific amendment in the legislative history, it appears that it was simply intended to cap the Director's discretion.

In 1998, the Legislature eliminated the distinction between higher value and lower value contracts and amended the

14

pertinent provision of section 14669 to read, as it does today, "The director shall not enter into a lease-purchase agreement that involves office space, unless specifically authorized to do so by the Legislature." (Stats. 1998, ch. 597, § 3 (A.B. No. 2459).)

We see no indication in these amendments to section 14669, or in the legislative history relating to them, that the Legislature intended to prohibit itself from authorizing the Director to enter into a lease-purchase or lease-option agreement through the annual budget process. If anything, the fact that the Legislature required such authorization in the 1981 Budget Bill, then required only notice to the Joint Legislative Budget Committee, and now requires "specific authorization" (rather than authorization "through the normal budgeting process" as it initially required) suggests that the Legislature intended to return to the expanded and more flexible procedure it adopted in the 1981 Budget Bill amendment.

We conclude, therefore, that the Budget Act of 2015 expressly authorized the purchase of the property by including a budget line item and monetary allocation specific to the property at issue and, further, that the Legislature implicitly authorized the conversion of the lease to a lease-option agreement as required to effectuate the purchase of the property.

### 1.4. The Director's failure to solicit bids before converting the lease agreement to a lease with purchase option agreement is not material.

As noted *ante*, section 14669 requires the Director to solicit bids before entering into a lease-purchase or lease-option agreement. It is undisputed that the State failed to do so in this case and therefore, as the court concluded, the State failed to fully perform under the lease. That fact does not end our inquiry,

15

however, because under Civil Code section 3392, a party may still obtain specific performance of a contract if the failure to perform is only partial and it is also "entirely immaterial." (Civ. Code, § 3392.) As the court noted, "there is little guidance as to the meaning of 'entirely immaterial' found in [Civil Code] § 3392." But we have no trouble concluding on the record before us, as the court did, that the State's failure to solicit competitive bids before deciding to purchase the property is immaterial here.

As discussed *ante*, the Legislature expanded the Director's authority to enter into lease-purchase and lease-option agreements in 1981 by removing the budget approval requirement that had originally been adopted. (Stats. 1981, ch. 919, §§ 1, 2.) At the same time, the Legislature added a provision requiring the Director to solicit written bids before entering into such an agreement and, further, to accept the lowest bid or reject all bids. (Stats. 1981, ch. 919, § 1, pp. 3465–3466 [adding to the text of section 14669, "The director shall solicit written bids for any lease-purchase or lease with option to purchase for real property in a newspaper of general circulation in the county in which the project is located. All bids received shall be publicly opened and the contract awarded to the lowest responsible bidder. If the director deems the acceptance of the lowest responsible bid is not in the best interest of the state, he may reject all bids."].) Section 14669 now contains a slightly modified version of this provision. (§ 14669, subd. (b) ["The director shall solicit written bids for any lease-purchase that involves office space in a newspaper of general circulation in the county in which the project is located. All bids received shall be publicly opened and the lease awarded to the lowest responsible bidder. If the director deems the acceptance of the lowest

16

responsible bid is not in the best interest of the state, he or she may reject all bids."].)

Legislative history is silent on the Legislature's intent in adding this provision. But as a general matter, "[p]rovisions requiring competitive bidding of government contracts ' "are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable ... and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest." ' (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 173.)" (*Unite Here Local 30 v. Department of Parks & Recreation* (2011) 194 Cal.App.4th 1200, 1209.)

On this record, we conclude the State's failure to engage in a competitive bidding process was immaterial. The conversion of the lease to a lease-option agreement enabled the State to buy the property—which is purportedly worth approximately $7 million—for one dollar. It is highly improbable that a competitive bidding process would have yielded a more favorable option for the State.[7]

## 2. The State is entitled to recover monetary damages.

In its cross-appeal, the State contends the court erred in denying its request for monetary damages flowing from the delay in performance of the lease's purchase option, i.e., the value of

---

[7] Landlord also argues that certain Federal Regulations required the State to obtain federal approval of the purchase. We reject this argument because compliance with such regulations is not required by the lease and therefore any failure to comply would not constitute a breach of the lease.

the rental payments the State made to Landlord during its holdover tenancy, and in awarding Landlord damages for unpaid rent that accrued between July 2017 and October 2017. We agree.

"The following general rules are applicable where damages are awarded incident to a decree of specific performance: A party to a contract for the purchase or exchange of land who is entitled to a decree of specific performance is also ordinarily entitled to a judgment for the rents and profits from the time he was entitled to a conveyance. The compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages. The complainant affirms the contract as being still in force and asks that it be performed. If the court orders it to be performed, the decree should as nearly as possible require performance in accordance with its terms. One of the terms is the date fixed by it for completion, and since that date is past, the court, in order to relate the performance back to it, gives the complainant credit for any losses occasioned by the delay and permits the defendant to offset such amounts as may be appropriate. The result is more like an accounting between the parties than like an assessment of damages." (*Ellis v. Mihelis* (1963) 60 Cal.2d 206, 219–220; 12 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 40:26.)

Caselaw establishes that when a court orders specific performance of a real estate purchase contract, the buyer is entitled to the rents and profits from the time the contract should have been performed, and the seller is entitled to an offset for the interest on the purchase money which he would have received had the contract been performed. (See *Bravo v. Buelow* (1985) 168 Cal.App.3d 208, 213–214 [collecting cases].) In addition, the

18

seller is entitled to an offset for the expenses of operation incurred from the date the contract should have been performed to the date of judgment. (*Ellis v. Mihelis, supra*, 60 Cal.2d at pp. 219–220; 12 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 40:26.) Interest may also be awarded for the loss of use of funds retained. (*Bravo,* at pp. 214–215 [collecting cases].)

In its cross-complaint, the State sought specific performance of the lease agreement as well as "compensation incidental to a decree of specific performance by virtue of the delay of [Landlord] in conveying the Premises." During the second phase of the bench trial, the State established that after the lease term expired, and before the State vacated the property in October 2017, the State paid Landlord rent in the amount of $1,349,076.30. The State is entitled to the return of all rents paid to Landlord following the termination of the 20-year lease term, offset by the purchase price, interest thereon, and Landlord's allowable operating expenses and costs as set forth above. Similarly, Landlord is not entitled to $363,784.94 in unpaid rent allegedly owed by the State during its holdover tenancy.

## DISPOSITION

The judgment is affirmed to the extent it grants the State's request for specific performance of the lease agreement. The trial court's damages award in favor of Landlord is reversed, and the matter is remanded to the court with instructions to enter an amended judgment awarding the State compensation equal to the amount of rent paid to Landlord during the State's holdover tenancy, which amount shall be offset by the property's purchase price ($1) plus interest at the legal rate, Landlord's allowable operating expenses, and other recoverable costs incurred by Landlord between the end of the lease term and entry of the amended judgment. The State shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

SALTER, J.*

---

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.